**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **TAMMIE MARQUEZ,** *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 2:19-cv-02362-DDC |
| v. | ) | |
| | ) | |
| **MIDWEST DIVISION MMC, LLC,** *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR UNOPPOSED MOTION
FOR ORDER CERTIFYING CLASS AND COLLECTIVE ACTION FOR PUPOSES OF
SETTLEMENT, PRELIMINARILY APPROVING CLASS AND COLLECTIVE
ACTION SETTLEMENT, DIRECTING NOTICE TO THE CLASS, APPOINTING
<u>CLASS COUNSEL, AND SCHEDULING FINAL APPROVAL HEARING</u>**

Respectfully Submitted,

CORNERSTONE LAW FIRM

By:    <u>/s/ M. Katherine Paulus</u>
        M Katherine Paulus   D Kan 23866
        m.paulus@cornerstonefirm.com
        Jessica M. McDowell  D Kan 78731
        j.mcdowell@cornerstonefirm.com
        5821 NW 72nd Street
        Kansas City, Missouri 64151
        Telephone        (816) 581-4040
        Facsimile        (816) 741-8889

        ATTORNEYS FOR PLAINTIFFS

## I.      INTRODUCTION

After engaging in extensive formal and informal discovery as more fully described in the proceeding sections, the parties to this matter held a voluntary mediation on April 23, 2021, with a third-party neutral mediator. After many hours of mediation, the parties, with the assistance of the mediator, and by way of a mediator's proposal, reached an agreement as to the monetary terms of a settlement on a hybrid Rule 23 class and FLSA collective basis but left additional material terms to be set forth and agreed upon in a written memorialization of the parties' settlement.  For many months thereafter, the parties continued negotiations and even reengaged the mediator for assistance. Ultimately, the parties were able to reach final agreement on the terms of a settlement, as discussed herein. *See* Ex. 1, Settlement Agreement.[1] Accordingly, the Named Plaintiffs Tammie Marquez, Neesha Perez, and Josiah Chumba (collectively, "the Named Plaintiffs" or "Plaintiffs") respectfully move the Court for an order certifying their class and collective action claims for purposes of settlement, preliminary approving the parties' proposed class and collective action settlement, approving the issuance of notice, and appointing class counsel.

## .II.      FACTUAL BACKGROUND

### A.  The Parties

The Plaintiffs have sued four different entities affiliated with HCA Healthcare:  (1) Midwest Division-MMC, LLC ("Defendant MMC"), which owns and operates Menorah Medical Center ("Menorah" the "hospital"); (2) HealthTrust Workforce Solutions, LLC ("Defendant HWS"), which is a staffing company that provides registered nurses ("RNs") to various hospitals and healthcare facilities, including Menorah; (3) Health Midwest Ventures Group, Inc., which formerly operated the Market Resource Float Pool ("Defendant HMVG"), which was a pool of RNs that served various

---

[1] Defendants have filed a motion for leave to file the Settlement Agreement under seal. *See* Doc. 92.  If the Court is not inclined to grant such leave, Plaintiffs will file an amended Exhibit 1 to this motion which includes the Settlement Agreement.

affiliates in the Kansas City area (it has since been disbanded); and (4) Health Midwest Medical Group, Inc., which Defendants contend the plaintiffs named by mistake. Ex. 2, Paulus Dec. at ¶ 4.

Named Plaintiffs Tammie Marquez and Neesha Perez formerly worked as RNs for Defendants HWS and HMVG, and seek to serve as the representative plaintiffs for the putative class cohort of similarly-situated RNs who worked for Defendant HWS or Defendant HMVG at Menorah during the relevant time period.[2] Ex. 2 at ¶ 5. Named Plaintiff Josiah Chumba also formerly worked as an RN at Menorah, but was directly employed by Defendant MMC. *Id.* at ¶ 6. RNs who are directly employed by MMC are subject to the terms of a Collective Bargaining Agreement ("CBA") between Menorah and Nurses United for Improved Patient Care, CAN/NNOC, AFL-CIO ("the Union"). *Id.* Plaintiff Chumba seeks to serve as the representative plaintiff for the putative class cohort of similarly situated RNs who were directly employed by MMC during the relevant time period. *Id.* Two opt-in plaintiffs also filed consents to join this matter. (Docs. 69-70) For purposes of the settlement agreement reached by the parties, the class period at issue is defined as July 3, 2016, through February 28, 2019.[3] *Id.* at ¶ 7. Based on information and documents produced by Defendants for this time period, there are a total of 843 putative class members; 229 of whom were employed by HWS or HMVG during the class period, and 574 of whom were employed by MMC during the class period. *Id.* at ¶ 8.

### B.  Overview of the Claims and Defenses at Issue

This case involves the following claims: (1) individual and putative collective action claims for unpaid overtime under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA") (*see*, Doc. 27,

---

[2] While Plaintiffs Marquez and Perez (and potentially, other class members employed by HWS and HMVG) performed work at facilities other than Menorah that might be indirectly affiliated with Menorah, the class alleged in this matter that Marquez and Perez will represent is limited to HWS and HMVG nurses who performed work at Menorah.

[3] Although the parties disputed the appropriate end date for the class period in this matter, the parties agreed to negotiate based on this class period for purposes of mediation, which was consistent with the prior agreement the parties made as to the temporal scope of the production of time records for a sample of the putative class.

Second Amended Complaint ("SAC"), at ¶¶ 68-94; and (2) individual and putative class action claims under Federal Rule of Procedure 23 for unpaid "straight time" damages under Kansas common law (Doc. 27, SAC at ¶¶ 95-105) and the Kansas Wage Payment Act, K.S.A. §§ 44-313, *et seq.* ("KWPA") (Doc. 27, SAC at ¶¶106-124). Plaintiffs Marquez, Perez, and Chumba each allege that one or more of Defendants' employees regularly edited their time records—without Plaintiffs' knowledge or authorization—to unlawfully add 30-minute unpaid meal breaks to their shifts, or to otherwise alter their clock-in and clock-out times to inaccurately reflect less time than Plaintiffs actually worked. (Doc. 27, SAC at ¶¶56-58). Plaintiffs further allege Defendants engaged in a practice of unlawfully editing time records, which also affected other similarly-situated nurses, resulting in them not being paid for all time worked.  Defendants deny these allegations.

    1. *Overview of Defendants' Relevant Policies and Practices*

Defendants maintain several timekeeping policies and practices relevant to Plaintiffs' claims. Ex. 2 at ¶ 10. These include Defendants' timeclock rounding practices, in which its timeclock system automatically rounds hourly employees' clock-in and clock-out times to the nearest quarter hour. *Id.* For example, if a nurse clocks in at 6:38 a.m., his/her/their clock-in time will automatically round forward to 6:45 a.m., but if that nurse clocks in at 6:37 a.m., his/her/their clock-in time will automatically round back to 6:30 a.m. *Id.* In this case, Plaintiffs allege that one or more of Defendants' employees regularly adjusted their clock-in and clock-out times to prevent rounding in their favor. *See id.* at ¶ 11.  And, although the language of Defendants' policies states that hourly employees are not permitted to clock in more than three to five minutes prior to the start of their shifts, Plaintiffs allege those policies were not enforced, and that they had never been subject to discipline for clocking in earlier than five minutes prior to the start of their shifts. *See e.g.* Ex. 6 Marquez Dep. at 79:22-80:18. Defendants deny these allegations.

Defendants HWS and HMVG also expected their hourly employees, including RNs like Plaintiffs Marquez and Perez, to take a 30-minute unpaid meal break each shift that they worked, as set forth in their respective Employee Handbooks. Ex. 2 at ¶ 13. By contrast, Defendant MMC's Employee Handbook states that non-exempt employees are "encouraged" to take meal periods only when "patient care needs" permit them to do so, and that if taken, the meal period must be at least "thirty (30) consecutive minutes in duration." *Id.* at ¶ 14. Defendant MMC's Employee Handbook also requires non-exempt employees to clock in and out for an uninterrupted meal period, and states that it is the employee's responsibility to notify his or her manager of an interrupted meal period. *Id.* Finally, Defendants HWS and MMC both have language in their respective Employee Handbooks stating that hourly employees are required to ensure the accuracy of their time records and promptly report any errors or omissions. *Id.* at ¶ 15. Plaintiffs allege, however, that during the Class Period, neither Defendant provided any means for its employees to regularly access or review their time records each pay period. *Id. See also* Ex. 3, Marquez Dec. at ¶ 10; Ex. 4, Perez Dec. at ¶¶ 11-12; Ex. 5, Chumba Dec. at ¶¶ 11-13. Defendants deny these allegations.

2. *Summary of Defendants' Defenses*

Defendants deny Plaintiffs' allegations, and assert that any adjustments or edits that were made by their employees to Plaintiffs' or other nurses' time records were made at the request of the nurses themselves, made to correct time records to align with the sign-in or sign-out times nurses recorded in the logbook or other external records, or made because nurses simply forgot to clock-in or clock-out for meal breaks they actually took. Defendants pleaded several affirmative defenses (*see, e.g.*, Docs. 30-32), and generally deny any liability or wrongdoing of any kind associated with the claims asserted in this case. Further, Defendants assert that the CBA governing MMC-employed nurses required those nurses to affirmatively inform their supervisor if they missed a lunch break and document this occurrence, otherwise MMC would assume they received and took their scheduled lunch break.

Defendants also assert that the Kansas state law claims of any nurses were employed by Defendant MMC are preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 141, *et seq.* ("LMRA"). *See* Ex. 2 at ¶ 92. While Plaintiffs disagree with Defendants' assertion, Plaintiffs acknowledge that both Parties have pointed to case law supporting their respective positions, and consequently, there appears to be a not insignificant risk that Defendants would ultimately prevail on this issue. *Id.*

### C.  Procedural History of the Case

Plaintiffs filed their initial Complaint on July 3, 2019. (Doc. 1) Plaintiffs subsequently amended their complaint twice, and the operative complaint—*i.e.,* the Second Amended Complaint ("SAC")— was filed on December 26, 2019. (Doc. 27) Discovery in this matter was structured in two phases, with Phase 1 focused on issues relevant to conditional and class certification, and Phase 2 focused on issues relevant the merits of the case. Due to the disruption and delays caused by the COVID-19 pandemic, the parties moved to extend the scheduling order deadlines on two separate occasions. (Docs. 50, 54, 59) Based on the Second Amended Scheduling Order, the deadline to file Motions to Certify as a Class or Collective Action was March 18, 2021. (Doc. 60)

Throughout this litigation, the parties have conducted extensive written discovery. The parties exchanged Rule 26(A)(1) Initial Disclosures, and amended and supplemental disclosures (*see, e.g.,* Doc. 18, 49, 53). Each named Plaintiff responded to the respective First Set of Interrogatories and Request for Production of Documents served by Defendants. (Docs. 25, 35) Plaintiffs also propounded written discovery to each Defendant, including three sets of Requests for Production of Documents to MMC. (Docs. 36, 45-48, 52, 58, 65) The parties have also conferred in good faith *via* telephone and e-mail on numerous occasions regarding discovery disputes that have arisen throughout this case. Ex. 2 at ¶ 71. For example, on January 8, 2021, Defendants made a supplemental production of more than 1,200 pages of documents and electronic time records. *Id.* The parties' counsel also conferred regarding

Plaintiffs' concerns that timekeeping data produced by Defendants was either incomplete or not inclusive of all categories of information requested by Plaintiffs. *Id.* Additionally, Defendants took the depositions[4] of Plaintiffs Marquez and Perez on January 11, 2021, and of Plaintiff Chumba on January 21, 2021. Plaintiffs also noticed and began preparing for the deposition Defendants' Human Resources Director, Yvonne Brewington, which was set to occur on February 16, 2021. (Doc. 66)

On February 12, 2021, the parties filed a joint Motion to Stay Discovery and Scheduling Order Deadlines (Doc. 71), for the parties to attempt a resolution at mediation. The parties also negotiated and reached a tolling agreement for the pendency of the stay. The Court granted the parties' request on February 16, 2021. (Doc. 74) The parties attended mediation with experienced mediator David C. Vogel on April 23, 2021, and reached a settlement in principle as to the monetary terms of the agreement. (Doc. 75)

### D. Characteristics of the Putative Class

#### 1. *Class Member Nurses Employed by Defendant MMC*

According to the pay and timekeeping data Defendants produced to Plaintiffs' counsel in connection with this settlement, there are approximately 574 putative class member nurses who were employed by Defendant MMC during the Class Period. Ex. 2 at ¶ 16. These class members were regularly scheduled to work eight-hour, ten-hour, or 12-hour shifts, with some class members' schedules varying between these lengths of shifts throughout the Class Period. *Id.* On average, these class members earned an average hourly rate of $34.41, however, the average individual hourly rates of pay for these class members varies widely, ranging from $12.08 to as high as $136.07. *Id.* at ¶ 17.

---

[4] Plaintiffs' depositions were initially scheduled to take place on April 7-8, 2020 (Docs. 37-39), and Plaintiffs began deposition preparations beforehand. However, the depositions were ultimately postponed due to the COVID-19 pandemic.

The variances in average hourly rates of pay for these can be attributed to several factors, including the wage scale rates under the CBA based on the nurses' credited years of experience, and the numerous types of shift differentials which may apply under different circumstances.[5] *Id.* at ¶ 18.

On average, these class members worked a total of approximately 2,457 hours, and 79 workweeks during the Class Period. *Id.* at ¶ 19. However, as with their hourly rates of pay, the actual number of hours and workweeks that individual class member worked during the Class Period varies widely. *Id.* While approximately 25% of these class members worked almost every workweek of the Class Period, approximately 16% of the class members worked 20 or fewer workweeks during the same time period. *Id.* And, notably, the number of hours worked by individual class members varies greatly even between those who worked the same number of workweeks during the Class Period.  For example, the total number of hours worked by class members who all worked 138 weeks during the Class Period ranges from 2,042 to 7,865 hours, which, in turn, results in an average number of hours worked per workweek ranging from 14.8 hours to 56.99 hours. *Id.* at ¶ 20.

### 2.   *Class Member Nurses Employed by Defendants HWS or HMVG*

According to the pay and timekeeping data Defendants produced to Plaintiffs' counsel in connection with this settlement, there are approximately 269 putative class member nurses who were employed by Defendants HWS or HMVG who performed nursing services at Menorah during the Class Period. Ex. 2 at ¶ 21. These class members were typically scheduled to work 12-hour shifts. *Id.* On average, these class members earned an average hourly rate of $45.37. *Id.* at ¶ 22. The class member nurses who worked for Defendants HWS or HMVG also have some variance in their individual, average hourly rates ranging from $20.00 up to $60.23. *See id.*

---

[5] Because of the ubiquity of shift differential pay codes which appeared in the sample data Defendants produced in advance of mediation—and in light of the fact that several shift differentials could result in meaningful increases to class members' rates of pay—Plaintiffs' counsel requested that Defendants produce average hourly rate of pay data for these class members which included shift differentials. Defendants did so in connection with this settlement, and, accordingly, the average hourly rates of pay referenced above include shift differentials. *Id.* at ¶ 18.

Likely because of the nature of their "as needed" staffing assignments at Menorah, the class member nurses who worked for Defendants HWS and HMVG averaged significantly fewer total workweeks and hours during the Class Period than the class member nurses who worked for Defendant MMC. *Id.* at ¶ 23. More specifically, the class member nurses who worked for Defendants HWS and HMVG worked an average total of 486.45 hours, 48 shifts, and 20 workweeks at Menorah during the Class Period. *Id.* Indeed, nearly 50% of these class members worked less than 10 workweeks, and 45% of them worked 10 or fewer shifts at Menorah during the Class Period. *Id.* at ¶ 24.

### 3. *Estimated Alleged Damages for the Named Plaintiffs and Estimated Damage Modeling for the Proposed Settlement Class*

After reviewing the time records, time edit records, and pay records Defendants produced for the Named Plaintiffs during discovery—and based on the Named Plaintiffs' individual allegations and testimony—Plaintiffs' Counsel calculated estimated, individual alleged damages for the Named Plaintiffs during the Class Period as reflected in the chart below. *Id.* at ¶ 26.

| Named Plaintiff | Total Straight Time Damages under the KWPA (including liquidated damages)[6] | Total Overtime Damages under the FLSA (including liquidated damages) | Total Combined Damages |
|---|---|---|---|
| Josiah Chumba | $1,320.00 | $30,174.00 | $31,494.00 |
| Tammie Marquez | $7,011.00 | $6,557.00 | $13,568.00 |
| Neesha Perez | $1,981.00 | $1,069.00 | $3,050.00 |

---

[6] Because liquidated damages are a statutory penalty pursuant to K.S.A. § 44-315(b), some courts have concluded that liquidated damages for KWPA claims are subject to a one-year statute of limitations under K.S.A. §60-514. *See e.g. Ingham v. Digital Sols., Inc.,* No. 98-2486-JWL, 2000 WL 126920, at *3 (D. Kan. Jan. 19, 2000). Accordingly, Plaintiffs' counsel only included liquidated damages for approximately 38% (which is equal to 52 out of 139 workweeks) of the Named Plaintiffs' straight time damages under the KWPA. Ex. 2 at ¶ 26, n.1. Plaintiffs' counsel similarly only included liquidated damages for 38% of the class members' straight time damages in their damage calculation modeling. *Id.*

Relevant to these calculations, during the Class Period, Plaintiff Chumba worked a total of 7,795.75 hours during approximately 650 shifts over the duration of 139 workweeks. *Id.* at ¶ 27. During the Class Period, Plaintiff Chumba also averaged slightly more than 56 hours of work per workweek, and his average hourly rate of pay was $50.03. *Id.* Plaintiff Chumba's time edit records reflect a total of 1,628 edits to his time entries during the Class Period. [7] *Id.* at ¶ 28. Under the assumption that the time clock adjustments to Plaintiff Chumba's time records during the Class Period were—as Plaintiffs allege—improper, Plaintiffs' counsel calculated that time clock adjustments to Plaintiff Chumba's time records during the Class Period resulted in him allegedly not being paid for as many as 225.5 hours that he actually worked; because of the high number of hours per workweek that Plaintiff Chumba typically worked, the vast majority of these alleged lost wages would be overtime damages under the FLSA. Ex. 2 at ¶ 29.

During the Class Period, Plaintiff Marquez worked a total of 2,607.00 hours during 309 shifts at Menorah over the course of 99 total workweeks. *Id.* at ¶ 30. She earned an average hourly rate of $48.57 during this time, and her time records reflect a 30-minute meal break from 1:00 a.m. until 1:30 a.m. on more than 150 of her shifts.[8] *Id.* Under the assumption that the time clock adjustments to Plaintiff Marquez's time records during the Class Period were—as Plaintiffs allege—improper, Plaintiffs' counsel calculated that time clock adjustments to Plaintiff Marquez's time records during

---

[7] Defendants allege the vast majority of these edits were made either with Plaintiff Chumba's knowledge or at his request, or were made to correct his "missed" time punches. For purposes of these calculations, however, Plaintiffs' counsel assumed each instance of a meal period being added to his time records was allegedly unlawful and resulted in purported damages to him. *Id.* In his deposition testimony, Plaintiff Chumba alleged he was typically too busy to take a meal break during his shifts, and he believes any time records which reflect him (or other nurses) regularly clocking out for meals for the precise time period of 1:00 a.m. until 1:30 a.m. are artificial because that was not consistent with his life as a nurse, and it simply did not work that way. Ex. 7 Chumba Dep. at 147:10-148:18.

[8] Additionally, although Plaintiff Marquez testified at her deposition that she was allegedly too busy to take a meal break during 80-90% of her shifts at Menorah, her time records from shifts she worked there during the Class Period show only approximately 20% of her shifts did not have a 30-meal break applied. Ex. 6, Marquez Dep. at 34:11-35:1. Plaintiff Marquez's time records also reflect nearly 100 instances of her shift start clock-in time being exactly 6:38 p.m., which was the earliest time she could have clocked-in and still have her time clock "round forward" to her scheduled shift start time of 6:45 p.m. Ex. 2 at ¶ 31.

the Class Period resulted in her allegedly not being paid for as many as 150 hours that she actually worked—45 of which would be overtime damages under the FLSA. Ex. 2. at ¶ 32. Finally, during the Class Period, Plaintiff Perez worked a total of approximately 1,111 hours during approximately 85 shifts at Menorah, over the course of 42 workweeks. *Id.* at ¶ 33. Her average hourly rate of pay was $48.83, and her time records reflect that a 30-minute meal period was applied to almost 60% of the shifts she worked there.[9] *Id.* Under the assumption that the time clock adjustments to Plaintiff Perez's time records during the Class Period were—as Plaintiffs allege—improper, Plaintiffs' counsel calculated that time clock adjustments to Plaintiff Perez's time records during the Class Period resulted in her allegedly not being paid for as many as 36.5 hours that she actually worked—approximately seven hours of which would be overtime damages under the FLSA. *Id.* at ¶ 35.

> a.   Overview of Factors Considered by Counsel in Creating Settlement Damage Modeling for the Class

Plaintiffs believe the differences between the class members' individual rates of pay, hours worked, number of shifts, and hours worked per workweek during the Class Period are all highly relevant to the calculation of their estimated damages for several reasons, as detailed in counsel's declaration. *See Id.* at ¶¶ 36-37. Because Plaintiffs' theory of violation is based on alleged adjustments or edits that Defendants' employees made to the Plaintiffs' and other nurses' time records, in order to more precisely calculate class members' alleged damages, Plaintiffs' counsel would first need to review each class member's individual time edit records to identify each edit made to their time records which ultimately resulted in them allegedly being paid for less time than they initially recorded. *Id.* at ¶ 38. And, because Defendants deny these edits were improper, and instead assert that these edits were

---

[9] Similar to the other Named Plaintiffs, Plaintiff Perez also alleged in her deposition testimony that she did not have sufficient time to take a meal break approximately 80% of the time that she worked at Menorah. Ex. 8, Perez Dep. at 63:2-19. Plaintiff Perez's time records also reflect numerous meal periods from 1:00 until 1:30 a.m. *Id.* at ¶ 34. Additionally, Plaintiff Perez's time records also reflect a total of 33 instances in which her clock-in time was exactly seven minutes prior to the start of her shift, or her clock-out time was exactly seven minutes after the scheduled end of her shift. *Id.*

made for legitimate purposes such as correcting missed time clock punches, Plaintiffs' counsel acknowledges that to accurately distinguish edits made for legitimate reasons from any which may have been improperly made, one would need to—at a minimum—compare each edit to Defendants' logbooks, sign-in sheets, and/or time clock edit sheets to confirm whether the reason for the edit could be substantiated by those records.  *Id.* at ¶ 39.

However, because there are approximately 843 class members who worked a collective total of approximately 139,532 shifts during a collective total of 51,175 workweeks during the Class Period, it would have been costly, labor-intensive, and arduous for Defendants to produce full time entry, time edit, and pay data for all class members in connection with this settlement, let alone for Defendants to produce all relevant time edit request sheets, sign-in sheets, hard copy logbooks, or any other extrinsic evidence that could be used to discern which (or according to Defendants whether) any of these edits were improperly made. *Id.* at ¶ 40. Moreover, it would have similarly been both inefficient and arduous for Plaintiffs' counsel to review and analyze all such records for purposes of calculating estimated and alleged damages for all class members.[10] Ex. 2 at ¶ 41. Consequently, in lieu of these records, Plaintiffs' counsel requested—and Defendants produced—aggregated data regarding each class member specific to the Class Period, including their individual average hourly rates of pay (including shift differentials), total hours worked, total workweeks, total number of shifts or typical length of shifts, and number of weeks in which they had received overtime pay.  *Id.* at ¶ 43.  Plaintiffs' counsel used this data, as well as the Named Plaintiffs' and sample[11] class members' time records that

---

[10] Additionally, as more fully described in counsel's declaration, each timestamped entry on the electronic time record and time edit record data that Defendants produced is formatted as a single, continuous string of digits reflecting the year, month, date, hour, minute, and second the entry was made (*e.g.* a clock-in time that occurred at 6:38 p.m. on the date June 5, 2018 is reflected in a single data field as "20180605183800"). *Id.* In Plaintiff counsel's opinion, this formatting makes the data visually unwieldy, extremely difficult to review manually, and requires extensive reformatting before even simple formulas or data tools can be applied to it. *Id.* at ¶ 42.

[11] In connection with discovery, Defendants agreed to produce time and time edit data for 100 randomly-selected class members for the agreed-upon Class Period. *Id.* at ¶ 73. Defendants produced this data in November 2020. *Id.*

Defendants had previously produced during discovery, to formulate a damage calculation model which attempted to approximate the frequency of time adjustments that the class members, in Plaintiffs' view, likely would have experienced. *Id.* at ¶ 44.

After analyzing the time records and edit data, Plaintiffs' counsel formed the opinion that class members who regularly worked a high number of hours per week appeared to be more likely to have a higher frequency of edits made to their time records than class members who worked a lower number of hours per week. *Id.* at ¶ 45. This is, in Plaintiffs' counsel's view, first evinced by the frequency of edits to Plaintiff Chumba's time records; out of all of the 843 class members, Plaintiff Chumba worked the second highest average number of hours per workweek during the Class Period. *Id.* at ¶ 46. But in the opinion of Plaintiffs' counsel, this is also supported by the time record edits for other sample class members. *See id.* at ¶¶ 47-51 (providing specific examples of class members supporting counsel's theory). Accordingly, Plaintiffs' counsel assigned: (1) each class member who worked for Defendant MMC to one of five "tiers" for purposes approximating the estimated number of shifts potentially impacted by edits; each tier is associated with a specific frequency multiplier (ranging from 0.2 to 0.75 at the highest), and (2) each class member who worked for Defendants HWS or HMVG to one of four similar frequency approximation tiers, with the associated frequency multipliers ranging from 0.15 to 0.5 at the highest). *Id.* at ¶¶ 55-61.

### E. The Settlement

1. *History of Settlement Negotiations*

Although the Parties reached a settlement in principle as to a total, maximum amount of a Global Settlement Fund at the conclusion of their April 27, 2021 mediation, there remained myriad material terms for the Parties to negotiate before they could finalize and seek approval of the settlement. *Id.* at ¶ 73. These terms included, but were not limited to whether any portion of the settlement would be reversionary, whether any unclaimed settlement funds would be redistributed on

a *pro rata* basis to participating class members, whether there would be a *cy pres* beneficiary of any unclaimed settlement funds, the scope of the release of claims by participating and non-participating class members, and the respective roles of the Settlement Administrator and Plaintiffs' Counsel in determining how settlement funds would be allocated between and among the class members. *Id.*

Over the summer and fall of 2021, the Parties continued negotiating these terms by way of exchanging and revising drafts of the settlement agreement and emails regarding same, holding telephone conferral conferences between their counsel, and exchanging legal authority supporting their respective positions. *Id.* at ¶ 74. At mediation, and throughout this case, counsel for the parties also engaged in extensive and lengthy discussions about the respective strengths and weaknesses of the claims and defenses asserted in the lawsuit. *Id.* In connection with the Parties' ongoing settlement negotiations, and agreements reached during this time, Defendants made a supplemental production of time and pay data regarding the settlement class members. *Id.* at ¶ 75; *see also* Ex. 1 at ¶ 33.

Eventually it became apparent the Parties had reached impasse as to a handful of remaining disputed settlement terms, and they agreed to reengage mediator David Vogel for a second mediation session on October 27, 2021. Ex. 2 at ¶ 76. After mediating for several hours, the Parties made significant progress in reaching agreement as to most of the remaining disputed issues. *Id.* Thereafter, the Parties continued to exchange proposals regarding the treatment of unclaimed settlement funds, and ultimately reached the compromise reflected in Paragraph 39 of the Parties' Settlement Agreement. *Id.* at ¶ 77; *see also* Ex. 1 at ¶ 39.

## 2. *Settlement Structure and Monetary Terms*

Under the terms of the Parties' Settlement Agreement, Defendants have agreed to pay a maximum, total Global Settlement Fund to fully resolve this matter, the amount of which is reflected in the attached Settlement Agreement. *See, generally,* Ex. 1. This Global Settlement Fund is intended to be inclusive of: (1) all settlement awards to participating class members; (2) any Service Awards to the

Named Plaintiffs approved by the Court; (3) payment to Plaintiffs' Counsel for any amounts of attorneys' fees, expenses, and costs approved by the Court, and (4) payment for settlement administration costs. *See id.* at ¶ 6. As set forth in the Settlement Agreement, after the amounts of any approved Service Awards, attorneys' fees, and Settlement Administrator's fees and expenses are deducted from the Global Settlement Fund, the remaining funds available for distribution to the class members' settlement awards is referred to as the Net Settlement Fund. *Id.* at ¶ 7.

Here, and as more fully set forth in Plaintiffs' Unopposed Motion for Approval of Attorneys' Fees and Costs and Service Awards to the Named Plaintiffs, Plaintiffs seek approval of a total amount of attorney's fees that amounts to 30% of the Global Settlement Fund, and a total of $2,100.00 in litigation costs. Ex. 2 at ¶ 78. Additionally, Plaintiffs also seek approval for a total amount of $36,000.00 in Service Awards to the Named Plaintiffs ($18,000.00 to Plaintiff Chumba, $11,000.00 to Plaintiff Marquez, and $7,000.00 to Plaintiff Perez) in recognition of the extensive amount of time these Plaintiffs devoted to this litigation and their representation of the putative class, the reputational risk they each undertook by being Named Plaintiffs in this lawsuit, and the additional inconvenience and added stress associated with being Named Plaintiffs while working full-time as nurses during the COVID-19 pandemic. *Id.* at ¶ 79. *See also, generally,* Ex 3, 4, 5, Marquez, Chumba, and Perez Declarations. Finally, based on the preliminary cost estimate prepared by the settlement administrator Plaintiffs' counsel intends to engage,[12] the Parties agreed to set aside $30,000.00 in Settlement Administration costs—subject to Court approval. *See* Ex. 2 at ¶ 80; Ex. 1 at ¶ 18. Any amounts of attorneys' fees or costs, Service Awards, or Settlement Administration costs which are not approved

---

[12] Per the terms of the Parties' Settlement Agreement, Plaintiffs must select a third-party Settlement Administrator within 14 days of the date the Agreement is executed, and Defendants must approve of the Settlement Administrator selection, as well as the written contract with the Settlement Administrator. *See* Ex. 1 at ¶ 36. Given the date of execution of the Settlement Agreement relative to the deadline for filing this motion, Plaintiffs will file a supplement to this motion which includes the name of the Settlement Administrator and additional information about their estimated costs and fees within 14 days of the date of filing.

by the Court will be reallocated to the Net Settlement Fund and paid to participating class members *via* their settlement awards. Ex. 1 at ¶ 50.

3. *Proposed Notice and Claims Process*

Under the Parties' Settlement Agreement, within ten days of the Court entering an order granting preliminary approval of the settlement: (1) Defendants will send the Settlement Administrator a list containing the class members' names, employee id numbers, and last known home or mailing address, and (2) Plaintiffs' Counsel will send the Settlement Administrator a list of the initial estimated Settlement Awards for each class member under the Plan of Allocation.[13] *See* Ex. 1 at ¶¶ 23-25. Thereafter, within 21 days, the Settlement Administrator will distribute the Notice and Claim Forms (found at Exhibit B to Exhibit 1) to all settlement class members by U.S. Mail. *Id.* at ¶ 27.

Importantly, the Settlement Administrator will include on each Notice the estimated amount of the Settlement Award the individual Settlement Class Member receiving the Notice will receive if he/she/they submits a timely Claim Form. *Id.* at ¶ 26. The Notice explains the class members' options under the settlement, and the impact of those options with respect to whether, or to what extent they will release or retain their individual claims they will release. *See* Exhibit B to Exhibit 1 at 1, 5-7; *see also* Exhibit 1 at ¶ 16 (differentiating between the scope of release for class members who submit a Claim Form versus those who neither submit a Claim Form nor opt-out of the settlement). This information will allow all class members the opportunity to make an informed decision as to whether they want to submit a Claim Form and participate in the settlement, opt-out of the settlement, or object to the settlement. Ex. 2. at ¶ 81. Because the Parties reached this proposed settlement prior to any conditional certification of a collective action in this matter, in order to comply with the procedural requirements of 29 U.S.C. § 216(b) of the FLSA, the Claim Forms also contain language stating the

---

[13] The list of initial estimated Settlement Awards that Plaintiffs' Counsel will provide to the Settlement Administrator will indicate the individual Settlement Awards for each class member using their respective Employee ID numbers for identification purposes. The Settlement Administrator will then match those awards to the class members' names from the class list information from Defendants.

class member is—by way of signing and submitting the Claim Form--affirmatively consenting to become a party-plaintiff under the FLSA. Ex. B. to Ex. 1 at 8.

Class members will have 75 days after the date Notice is first issued to submit a Claim Form, and they can submit those forms by U.S. Mail, by email, or through the informational website the Settlement Administrator will set up for this settlement. *See* Ex. B to Ex.1 at 4, 8. For any notices that are returned to the Settlement Administrator as undeliverable, the Settlement Administrator shall take reasonable steps to locate an updated mailing address using, if needed, the class members' Social Security numbers provided by Defendants. *See* Ex. 1 at ¶ 27. Thirty days after the Settlement Administrator distributes the initial Notice, the Settlement Administrator will mail a postcard to all settlement class members who have not yet submitted a Claim Form or a request to opt-out of the settlement; this postcard will remind them of the deadlines to submit Claim Forms and Opt-Out Requests. *Id.*

a.  Procedures for Settlement Class Members to Opt out or Object to Settlement

Under the terms of the Parties' Settlement Agreement, and as described in the Notice, any class member who wishes to opt out of the settlement must, within 45 days of the date Notice is distributed, submit to the Settlement Administrator an Opt-Out Request in the form of a written, signed statement which includes his/her/their name, current address, telephone number and the last four digits of his/her/their Social Security number or Employee ID, and which states, "I wish to be excluded from the *Marquez et al. v. Midwest Division-MMC, LLC et al.* settlement. I understand by excluding myself, I will not receive any money from the settlement reached in this matter." *Id.* at ¶ 29. As described in the Notice, any class members who wish to object to the settlement must submit a written objection by mail to the Court's Clerk within 45 days of the date Notice is distributed; this notice of objection should state the class member's full name, address, telephone number, last four digits of his/her/their Social Security or Employee ID number, and include the basis for the objection

and a reference to Case No. 2:19-cv-02362-DDC. *See* Ex. B. to Ex. 1 at 5-6. The Notice also advises class members who wish to object that they may, but are not required to, enter an appearance through counsel of their own choice. *Id.* at 5.

### b.  Treatment of Unclaimed Settlement Funds

After the expiration of the Claims Deadline, any unclaimed settlement funds resulting from class members who do not submit Claim Forms, who cannot be located, or who submit Opt-Out Requests will be, if applicable, first reallocated and redistributed on a *pro rata* basis to increase the individual alleged FLSA overtime damages and/or alleged KWPA straight time damages portions of the original, estimated Settlement Awards to all participating class members. *See* Ex. 1 at ¶ 39. During the Parties' extensive settlement negotiations, Defendants expressed concerns that in the event of unexpectedly low settlement participation rates, a redistribution of unclaimed settlement funds to participating class members could result in windfalls by way of settlement awards which greatly exceed the class members' actual alleged damages. Ex. 2 at ¶ 83. Consequently, the Parties ultimately agreed that any such reallocation and redistribution of unclaimed settlement funds to participating class members would be "capped" at certain percentages.[14] *Id. See also* Ex. 1 at ¶ 39.

Thereafter, the Parties agreed that fifty percent (50%) of any remaining amounts of unclaimed settlement funds resulting from class members who cannot be located, who do not submit Claim Forms, or who submit Opt-Out Requests will be distributed to the agreed *cy pres* recipient, the HCA Hope Fund (or such other similar charitable institution upon which the Parties might agree), and fifty percent (50%) will revert to Menorah. *Id. See also* Ex. 2 at ¶ 85. The Parties' preferred *cy pres* recipient is the HCA Hope Fund, which is a 501(c)(3) organization that provides emergency funds to employees

---

[14] Because this *pro rata* reallocation and redistribution would occur before class members' settlement award checks are issued, the Settlement Administrator would not be required to issue a second round of checks to participating class members. Ex. 2 at ¶ 84.  Instead, the Settlement Administrator will provide a report reflecting the exact amounts of any such distributions, as well as the total, increased amounts of the participating class members' settlement awards, and Plaintiffs will provide those final settlement award amounts to the Court in advance of the Final Fairness Hearing. *Id. See also* Ex. 1 at ¶ 39(d).

of hospitals, medical facilities, and other entities affiliated with HCA Healthcare (such as Menorah) when significant hardships arise due to illness, injury, natural disasters or other difficult situations that impact employees' essential needs. *Id.* at ¶ 86.

Finally, under the terms of the Settlement Agreement, the Parties agree that any unclaimed settlement funds resulting from class members failing to negotiate their settlement award checks within 180 days of their date of issuance will revert to Menorah. Ex. 1 at ¶ 46.

### 4. *Proposed Plan of Allocation*

Under the Plan of Allocation proposed by Plaintiffs' counsel, the Net Settlement Fund (*i.e.* the total amount of settlement funds available for distribution to the class members *via* their individual settlement awards) will be initially divided into separate, designated allocations for class members' alleged overtime damages under the FLSA ("FLSA Allocated Funds"), and for class members' straight-time damages under the KWPA ("KWPA Allocated Funds"). Ex. 2 at ¶¶ 64, 65. All settlement award shares will be calculated as a prorated amount of the damage calculations Plaintiffs' counsel formulated under the class settlement damage model, with class members receiving a minimum settlement award of $20.00. *Id.* at ¶¶ 67-70.

### 5. *Claims Released by Class Members*

The scope of the claims that class members will release depends on whether they submit a Claim Form and participate in the settlement, or whether they choose to neither submit a Claim Form nor a Request to Opt-Out of the Settlement. *See* Ex. 1 at ¶ 16; Ex. B. to Ex. 1 at 1, 5-7. In most pertinent part, class members who submit a Claim Form will release the claims asserted in the lawsuit, and "any and all FLSA and Kansas state-law wage-and-hour-related claims related to the claims asserted in the lawsuit…" Ex. B. to Ex. 1 at 6; *see also* Ex. 1 at ¶ 16. By contrast, class members who do not submit a Claim Form or an Opt-Out Request will similarly release their state law wage-and-

hour claims asserted in, and related to the claims asserted in this lawsuit, but will not release their

rights under the FLSA. *See id; see also* Ex. 1 at ¶ 16.

## II.      ARGUMENT & AUTHORITIES

"Court approval is required to settle both Rule 23 class actions and FLSA claims."

*Florece v. Jose Pepper's Restaurants, LLC,* No. 20-2339-ADM, 2021 WL 5038773, at *2 (D. Kan. Oct. 29,

2021). *See also Pliego v. Los Arcos Mexican Rests., Inc.,* 313 F.R.D. 117, 127-28 (D. Colo. 2016) (discussing

approval of a settlement agreement in a hybrid FLSA collective and Rule 23 class action). When a

court has not yet certified an FLSA collective action or a Rule 23 class action, "the court must first

consider certification before addressing the proposed settlement." *Id. See also Flerlage v. US Foods, Inc.,*

No. 18-2614-DDC-TJJ, 2020 WL 4673155, at *2-*4, *8 (D. Kan. Aug. 12, 2020).  Here, in connection

with their request for preliminary approval of the Parties' proposed hybrid settlement, Plaintiffs seek

certification under Rule 23 of a KWPA settlement-only class defined as, "all hourly Registered Nurses

who performed work for Defendants at Menorah Medical Center between July 3, 2016 and February

28, 2019." Plaintiffs similarly seek conditional certification of a settlement-only class under 29 U.S.C.

§216(b) of the FLSA defined as, "all hourly Registered Nurses who performed work for Defendants

at Menorah Medical Center between July 3, 2016 and February 28, 2019."

### A.  The Settlement Class Satisfies the Requirements of Rule 23(a) and Rule 23(b)(3) for Purposes of Class Certification[15]

A class action that may be settled with court approval under Rule 23(e) is "one qualified for

certification under Rule 23(a) and (b)." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620-21 (1997). In

other words, a party seeking certification of a settlement-only class must still meet the "'strict burden'"

of establishing that the prerequisites of Rule 23(a) and (b) are met. *Florece,* 2021 WL 5038773 at *2

(quoting *Trevizo v. Adams,* 455 F.3d 1155, 1162 (10th Cir. 2006)). However, because the proposal of a

---

[15] Defendants dispute that Rule 23 certification is appropriate, but have agreed not to oppose Plaintiffs' request for certification as part of settling this matter, in light of the costs and risks inherent in all litigation.

settlement class does not contemplate a trial of the asserted class claims, the Court "need not inquire whether the case if tried, would present intractable management problems…" *Amchem,* 521 U.S. at 620 (citing Fed. R. Civ. P. 23(b)(3)(D)). Here, certification of the settlement class is warranted and appropriate because the class meets each of the requirements of Rule 23(a) and (b).

### 1. *The Settlement Class Meets the Numerosity Requirement*

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Plaintiff must "produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved." *Bennett v. Sprint Nextel Corp.,* 298 F.R.D. 498, 504 (D. Kan. 2014). "[T]here is no set formula to determine if the class is so numerous that it should be so certified." *Trevizo,* 455 F.3d at 1162 (quotation omitted). The inquiry is fact-specific, and the district court has "wide latitude … in making this determination." *Id.* Here, Defendants' records reflect that approximately 843 nurses fit the class definition. Ex. 2 at ¶ 8. Courts within the Tenth Circuit have regularly found that classes of more than 500 members would be considered so numerous that joinder would be impracticable. *See, e.g. Florece,* 2021 WL 3634683, at *2–3 (D. Kan. Aug. 17, 2021) (class of more than 500 individuals met numerosity requirement); *Decoteau v. Raemisch,* 304 F.R.D. 683, 687-88 (D. Colo. 2014) (finding a class of at least 500 individuals satisfied Rule 23(a)(1)); *Armstrong v. Powell,* 230 F.R.D. 661, 674-75 (W.D. Okla. 2005). Accordingly, the proposed KWPA settlement class meets the numerosity requirement of Rule 23(a)(1).

### 2. *The Settlement Class Meets the Commonality Requirement*

The "commonality" requirement of Rule 23(a)(2) requires Plaintiffs to show "that questions of law or fact are common to the class, that is, members of the putative class possess the same interest and suffer the same injury." *Knight v. Mill-Tel, Inc.,* 11-1143-EFM, 2013 WL 3895341, at *2 (D. Kan. July 29, 2013). For purposes of establishing commonality, the class claims "must depend upon a common contention…of such a nature that it is capable of class wide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 359 (2011). Here, the settlement class meets the commonality requirement for several reasons.

First, the putative class members were all subject to the same time and pay policies. Ex. 2 at ¶¶ 10-15. *See, e.g. Garcia v. Tyson Foods, Inc.,* 890 F.Supp.2d 1273, 1283 (D.Kan. 2012) (finding commonality requirement met for KWPA class where the employees were paid under the same policies), *aff'd,* 770 F.3d 1300 (10th Cir. 2014). Second, there are numerous questions of fact common to all of the putative class members' claims, including whether Defendants accurately paid putative class members all of their wages due for the hours they worked and whether Defendants' employees made adjustments to the putative class members' time records which resulted in them being paid less than they were owed for all the time they worked. Finally, these common questions of fact ultimately lead to the common question of whether Defendants' timekeeping practices violated the KWPA. Whether Plaintiffs can show Defendants' practices violated the KWPA "will resolve an issue central to" all of the putative class members' claims. *Florece,* 2021 WL 3634683 at *3. *See also Dukes,* 564 U.S. at 350 ("What matters to class certification…is not the raising of common 'questions'—even in droves—but, rather, the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (emphasis in original) (internal citations omitted). In other words, Plaintiffs satisfy the commonality requirement because their "ability to prove a violation of law occurred is common to all putative class members' claims; a common answer that will drive the litigation's outcome." Therefore, plaintiffs satisfy the commonality requirement. *Flerlage v. US Foods, Inc.,* No. 18-2614-DDC-TJJ, 2020 WL 4673155, at *3 (D. Kan. Aug. 12, 2020).

### 3. *The Settlement Class Meets the Typicality Requirement*

Under the typicality requirement of Rule 23(a)(3), Plaintiffs' claims must be typical of the claims of the putative class they seek to represent. Typicality does not require that the Plaintiffs' claims

be identical to the class members' claims, but "they must not be significantly antagonistic." *Id.* at *4. Moreover, as the Tenth Circuit has explained, class members' differing fact situations will not defeat typicality, "so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.,* 765 F.3d 1205, 1216 (10th Cir. 2014) (quotation omitted).

In this case, the Plaintiffs' claims and interests are nearly identical—and not in any way antagonistic—to the claims and interests of the putative settlement class members.[16] This Court, as well as other courts within this district, have found this to be a sufficient demonstration of typicality. *See e.g. Flerlage,* 2020 WL 4673155 at *3 (finding typicality requirement satisfied where "plaintiffs' legal and remedial theories are identical to those of the putative class"); *Florece,* 2021 WL 3634683 at *4 (finding typicality satisfied where named plaintiff's "legal and remedial theories" were identical to those of the class); *Garcia,* 890 F. Supp.2d at 1283 (finding the plaintiffs proved typicality for a KWPA class, where their legal theory that the defendant's pay policies resulted in undercompensation applied to all employees). Plaintiffs respectfully request this Court similarly find that the proposed settlement class in this matter meets the typicality requirement of Rule 23(a)(3).

### 4.  *Plaintiffs and their Counsel Meet the Adequacy Requirement*

Under the adequacy requirement of Rule 23(a)(4), Plaintiffs must show they will "fairly and adequately protect the interests of the class." To do so, Plaintiffs must actually be members of the class they seek to represent, must show their interests do not conflict with the interests of class members, and must show they will "vigorously prosecute the action through qualified counsel." *Florece,*

---

[16] Moreover, typicality is not undermined here by any differing fact situations between the putative class members who worked for Defendants HWS or HMVG at Menorah, and the putative class members who were directly employed by Defendant MMC. Rather, as evidenced by the similarities between Plaintiff Chumba's allegations, and the allegations of Plaintiffs Marquez and Perez, it is clear that Plaintiffs' legal and remedial theories under the KWPA—*i.e.* that Defendants' alleged practice of making time record adjustments allegedly resulted in them not receiving all wages they were owed—apply to all class members as well.

2021 WL 3634683 at *4 (citing *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10ᵗʰ Cir.

2002)). Notably, "[m]inor conflicts among class members do not defeat certification; to defeat class

certification, a conflict must be fundamental and go to specific issues in controversy." *In re Motor Fuel*

*Temperature Sales Pracs. Litig.,* 292 F.R.D. 652, 671 (D. Kan. 2013)(quotation omitted). "A fundamental

conflict exists where some class members claim to have been harmed by conduct which resulted in

benefit to other class members." *Id.*

 Here, Plaintiffs Marquez, Perez, and Chumba are each members of the settlement class they

seek to represent. Ex. 2 at ¶¶ 5-6. None of these three Plaintiffs have any known conflicts of interest

with the putative settlement class members related to the specific issues in controversy in this case. *Id.*

at ¶ 105. Rather, the Plaintiffs have sustained the same alleged injuries as the putative settlement class

members, and Plaintiffs have not alleged any claims that would be harmful to the claims of any

settlement class members. And, as evidenced by the declarations each of these Plaintiffs provided

here, and also submitted in support of Plaintiffs' Unopposed Motion for Approval of Attorneys' Fees,

Costs, and Service Awards ("Fee Approval Motion"), the Plaintiffs have vigorously participated in,

and ensured the prosecution of this litigation by and through their retained counsel. *See* Ex. 3 at ¶¶

21-33; Ex. 4 at ¶¶16-29; Ex. 5 at ¶¶ 13-24. Finally, as more fully addressed in their Fee Approval Motion,

Plaintiffs' counsel are sufficiently qualified and experienced to represent the members of the

settlement class. *See also* Ex. 2 at ¶¶ 98-105, Ex. 9 at ¶¶ 6-23. Accordingly, Plaintiffs respectfully assert

they have met the adequacy requirement of Rule 23(a)(4).

 5. *The Settlement Class Meets the Predominance and Superiority Requirements of Rule*
  *23(b)(3)*

 Here, Plaintiffs seek class certification under Rule 23(b)(3), which requires a showing that

"questions of law or fact common to class members predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation omitted). Here, the common questions of law and fact described in Section III.A.2. predominate over any individualized questions. Indeed, courts "routinely have found predominance where…the challenged [wage] policy is common to the class as a whole and the proposed class members share similar job duties." *Felps v. Mewbourne Oil Co.,* 336 F.R.D. 664, 675 (D.N.M. 2020) (collecting cases); *see also Pliego,* 313 F.R.D. at 127 (finding common questions predominate where the controversy spanned the hourly wage workforce and raised common questions including whether the defendants' overtime policy violated the law).

Predominance is met in this case for the same reasons. Plaintiffs and the putative settlement class members all held hourly, RN positions, and "the case turns on whether" Defendants' alleged practices at the Menorah location violated the KWPA by denying class members payment of all wages due. *Florece,* 2021 WL 3634683 at *5 (finding predominance where plaintiff and class members "all held the same server position" and the "case turn[ed] on whether defendants' policy (or policies) violated the MMWL by denying lass members minimum wage and overtime compensation."). Whether Defendants' alleged practice of adjusting nurses' time records at Menorah violated the KWPA is a "common issue that is susceptible to generalized, class-wide proof and predominates over any individual questions, such as the damages due to each class member." *Id.* Consequently, the settlement class meets the predominance requirement of Rule 23(b)(3).

The settlement class also meets the superiority requirement of Rule 23(b)(3), because Plaintiffs' claims and the claims of the putative settlement class members are substantially similar, are predicated upon the same evidence (such as edit/audit time record data), and would largely require the same witnesses and exhibits. Accordingly, a class action is superior to potentially hundreds of discrete

actions that could be "grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation." *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 513 (D. Kan. 2014). Superiority is also demonstrated under an analysis of the other pertinent factors enumerated in Rule 23(b)(3), including "the class members' interests in individually controlling the prosecution or defense of separate actions" and "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3).[17] With respect to the first factor, as this Court has previously concluded, "[c]lass members have little interest in individually controlling the prosecution of separate [KWPA] actions because the amount at stake for each individual class member is small relative to the cost of maintaining a separate action." *Flerlage*, 2020 WL 4673155 at *4. Finally, because the settlement class encompasses only nurses who performed services at a single hospital location in Kansas, it is certainly desirable to concentrate the litigation of their claims in this Court. *See id* (concluding Kansas was an "appropriate forum" for a class that "encompasses only people who worked in Kansas").

As demonstrated by the preceding sections, the settlement class meets the requirements of both Rule 23(a) and Rule 23(b)(3). Consequently, Plaintiffs respectfully request the Court grant their motion for preliminary certification of a settlement class under Rule 23.

### B. Conditional Certification is Warranted Under the FLSA[18]

As this Court has previously noted, "[t]he parties to an FLSA action must present a settlement of those claims to the court for review and a determination that the settlement is fair and reasonable." *Enegren v. KC Lodge Ventures LLC,* 2019 WL 5102177, at *3 (D.Kan. Oct. 11, 2019) (citing *Barbosa v.*

---

[17] The other two enumerated factors in Rule 23(b)(3) are not particularly applicable here, as Plaintiffs are not aware of the existence of any similar litigation by individuals who may be class members here, and because Plaintiffs are seeking certification of a settlement-only class which will resolve the class claims without a trial, and thus, any trial manageability concerns are not relevant. *See* Fed. R. Civ. P. 23(b)(3).

[18] Defendants also dispute that FLSA certification is appropriate, but have agreed not to oppose Plaintiffs' request for certification as part of settling this matter, in light of the costs and risks inherent in all litigation

*Nat'l Beef Packing Co.,* LLC., 2015 WL 4920292, at *3 (D. Kan. Aug. 18, 2015)). When parties reach a settlement involving FLSA collective action claims prior to conditional certification, the named plaintiffs may ask the Court to: "(1) conditionally certify the proposed settlement class, (2) preliminarily approve the proposed settlement and (3) approve the proposed notice to putative class members." *Elston v. Horizon Global Americas,* Inc., 2020 WL 6318660, at *3 (D.Kan. Oct. 28, 2020) (citing *Christeson v. Amazon.comksdc, LLC,* 2019 WL 354956, at *5 (D.Kan. Jan. 29, 2019)). Here, because the Parties reached a settlement to resolve FLSA collective action claims prior to the Court actually granting conditional certification of a collective action, Plaintiffs now seek conditional certification of a settlement collective action "class" in connection with their request for preliminary approval of a settlement.

In this district, courts typically use a two-step approach when determining whether plaintiffs are "similarly situated" for purposes of the collective action provision of the FLSA found at 29 U.S.C. 216(b). *See Thiessen v. GE Capital Corp.,* 267 F.3d 1095, 1105 (10th Cir. 2001). Under this approach, the court typically makes an initial "notice stage" determination whether plaintiffs are "similarly situated" such that a collective action should be conditionally certified for purposes of sending notice to potential class members. *See id.* at 1102; *see also Brown v. Money Tree Mortg., Inc.,* 222 F.R.D. 676, 679 (D. Kan. Aug. 23, 2004). For conditional certification at the notice stage, the court requires "nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Thiessen,* 267 F.3d at 1102 (quotations omitted). The standard for certification at the notice stage is a lenient one that typically results in class certification. *See Brown,* 222 F.R.D. at 679. "This initial stage determination certifies the case as a collective action for purposes of

sending the opt-in notice to potential class members." *Flerlage v. US Foods, Inc.,* No. 18-2614-DDC-TJJ, 2020 WL 4673155, at *8 (D. Kan. Aug. 12, 2020) (citing *Thiessen,* 267 F.3d at 1102).[19]

1.   *Plaintiffs Have Presented Substantial Allegations Sufficient to Warrant*
     *Conditional Certification of a Settlement-Only Collective Class*

In the operative Second Amended Complaint, the Named Plaintiffs allege they, and other similarly-situated nurses who worked at Menorah were all victims of an alleged policy, plan, or practice by Defendants to deprive them of overtime compensation for all hours they worked in excess of 40 each workweek. *See e.g.* Doc. 27 at ¶¶ 36-41, 46, 58, 88. The Named Plaintiffs also each testified—in depositions and in their declarations—that they, and other similarly-situated nurses who worked at Menorah did not have Kronos system access to view their time records each week or pay period, and did not have any other method or means to regularly review their time entries during the Class Period. *See* Ex. 3 Marquez Dec. at ¶¶ 10-11; Ex. 5, Perez Dec. at ¶¶ 10-12; Ex. 4, Chumba Dec. at ¶¶ 11-13; Ex. 7, Chumba Dep. at 36:14-37:2, 107:18-108:5; Ex. 8, Perez Dep. at 56:15-21, 72:24-73:12; Ex.6, Marquez Dep. at 58:21-59:9, 89:12-90:4. Because of this, Plaintiffs allege that they, and other similarly-situated nurses, were not aware of the edits being made to their time records because they were not given the opportunity to review their time records before they were submitted to payroll.

Moreover, the Named Plaintiffs have provided testimony alleging they were unable to take a 30-minute meal break during 80-90% of their shifts at Menorah, and have also testified as to their observations about the alleged inability of their fellow, similarly-situated nurses to regularly take such breaks. *See e.g.* Ex. 6 at 33:2-5:1, 65:10-66:6. Plaintiff Marquez also alleges she reviewed her historical time records through the electronic access she gained when she began working for Defendant HMVG in the Market Float Pool at Menorah in January 2019, and discovered myriad instances where someone

---

[19] The second stage under this two-stage approach typically occurs after discovery is complete—upon the motion of a party-- at which time the court "determines whether the case should remain certified, or be decertified using a stricter standard." *Flerlage,* 2020 WL 4673155 at *8.

altered her clock-in or clock-out times, or added a 30-minute unpaid meal break to her records. Ex. 3, Marquez Dec. at ¶¶ 10-12.

Finally, as summarized in Plaintiffs' counsel's declaration, the time edit data that Defendants produced for a sample of 100 class members reflects numerous instances in which Defendants' employees edited their time records to add a 30-minute meal period to their shifts, or to adjust their clock-in, or clock-out times. Ex. 2 at ¶¶ 47-51, 72. Defendants dispute that these edits are a violation of the FLSA because Defendants contend they were made for a legitimate purpose, such as correcting the time records for nurses who simply forgot to clock out for meal breaks they actually took. Plaintiffs contend, however, that they have provided sufficient evidence to meet the lenient, first stage burden for conditional certification of a settlement-only collective action class. Accordingly, Plaintiffs respectfully request this Court grant their motion for conditional certification and authorize the issuance of notice to the putative settlement collective class members.

### C. Preliminary Approval of the Settlement is Appropriate Under Rule 23

Whether a settlement warrants approval is within the trial court's sound discretion. *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984). The settlement approval process typically occurs in two phases. First, the court considers whether preliminary approval of the settlement is appropriate. *See e.g. Freebird, Inc. v. Merit Energy Co.*, No. 10-1154-KHV, 2012 WL 6085135, at *4 (D. Kan. Dec. 6, 2012). "If the Court grants preliminary approval, it directs notice to class members and sets a hearing at which it will make a final determination on the fairness of the class settlement." *In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488, 492 (D. Kan. 2012); *see also Newberg on Class Actions* § 13:10 ("[T]he court's primary objective [at the preliminary approval stage] is to establish whether to direct notice of the proposed settlement to the class, invite the class's reaction, and schedule a final fairness hearing."). Second, "taking account of all of the information learned during

[the preliminary approval] process, the court decides whether to give 'final approval' to the settlement." *Newberg on Class Actions* § 13:10.

Because preliminary approval is just the first step of the approval process, courts, including this one, typically apply a "less stringent" standard than that at final approval.  *See e.g. Flerlage v. US Foods, Inc.,* No. 18-2614-DDC-TJJ, 2020 WL 4673155, at *5 (D. Kan. Aug. 12, 2020); *Freebird*, 2012 WL 6085135 at *5. "[D]istrict courts have developed a jurisprudence whereby they undertake some review of the settlement at preliminary approval, but perhaps just enough to ensure that sending notice to the class is not a complete waste of time." *Newberg on Class Actions* § 13:10. "The general rule is that a court will grant preliminary approval where the proposed settlement is neither illegal nor collusive and is within the range of possible approval." *Id.* (internal citation omitted). Indeed, "[c]ourts considering [class action] settlements do so in light of the strong presumption of favoring compromise of disputes generally, but which 'is especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.'" *Hershey v. ExxonMobil Oil Corp.,* No. 07-1300-JTM, 2012 WL 5306260, at *1-2 (D.Kan. Oct. 26, 2012) (quoting *Rutter,* 314 F.3d at 1188).

Under Federal Rule of Civil Procedure 23(e)(2), the court may approve a proposed class action settlement "only on a finding that is fair, reasonable and adequate," which requires a consideration of whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

30

Fed. R. Civ. P. 23(e)(2). In addition to the factors outlined in Rule 23(e)(2), the Tenth Circuit also requires courts to consider the following four factors when assessing whether a proposed settlement is "fair, reasonable, and adequate:"

> (1) Whether the proposed settlement was fairly and honestly negotiated;
> (2) Whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
> (3) Whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
> (4) The judgment of the parties that the settlement is fair and reasonable.

*Rutter & Wilbanks Corp. v. Shell Oil, Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). As other courts within this district have noted, these *Rutter* factors are similar to—and in some instances overlap with—the factors outlined in Rule 23(e)(2). *See, e.g. Florece,* 2021 WL 3634683 at *11–12 (noting *Rutter* factors are similar to those under the revised Rule 23(e)(2)); *Chavez Rodriguez v. Hermes Landscaping, Inc.,* No. 17-2142-JWB-KGG, 2020 WL 3288059, at *2 (D. Kan. June 18, 2020) (noting that the *Rutter* factors largely overlap with the factors set forth in Rule 23(e)(2)).

Importantly, "[w]hile the Court will consider [the Tenth Circuit's] factors in depth at the final approval hearing, they are a useful guide at the preliminary approval stage as well." *In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. at 502–03. And as stated in Rule 23(e)(1)(B), the Court must direct notice to the class if the parties can show, "that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). Here, Plaintiffs can show that the Court will likely be able to approve the settlement under Rule 23(e)(2), because each of the relevant factors under that Rule (as well as each of the similar *Rutter* factors) favors approval of the Parties' proposed settlement.

### 1. *The Settlement Class was Adequately Represented*

As another court within this district has noted, courts sometimes analyze this factor by evaluating the adequacy requirement of Rule 23(a)(4). *See Chavez Rodriguez,* 2020 WL 3288059 at *2 (collecting cases). Here, the settlement class was adequately represented for the same reasons Plaintiffs

31

and their counsel meet the adequacy requirement of Rule 23(a)(4). More specifically, the Named Plaintiffs have vigorously ensured prosecution of this litigation by and through their retained, experienced counsel. *See* Ex. 3 at ¶¶ 21-33; Ex. 4 at ¶¶16-29; Ex. 5 at ¶¶ 13-24. And as more fully addressed in their Fee Approval Motion, Plaintiffs' counsel are experienced class action litigators, and well-qualified to represent the members of the settlement class. *See also* Ex. 2 at ¶¶ 98-105, Ex. 9 at ¶¶ 6-23. Consequently, this factor favors settlement.

2.   *The Proposed Settlement was Fairly and Honestly Negotiated at Arms' Length*

Both Parties in this matter are represented by experienced class action counsel, and there is no evidence of collusion between the Parties. Rather, the Parties actively engaged in written discovery, conferred on multiple occasions regarding discovery disputes and other discovery issues, and took depositions before deciding to engage neutral mediator David Vogel. Ex. 2 at ¶ 71. Even after reaching a settlement in principle at mediation as to the overall monetary terms of the settlement, the Parties continued to engage in extensive negotiations regarding hotly contested settlement terms over the course of several months, including attending a second mediation session with Mr. Vogel in October 2021. *Id.* at ¶¶ 73-77. Where, as here, *"*counsel has vigorously advocated for their respective clients' positions," other courts within this district have found that this factor favors approval. *Florece v. Jose Pepper's Restaurants, LLC,* No. 20-2339-ADM, 2021 WL 5042715, at * 4 (D.Kan. Oct. 29, 2021). *See also Tripp v. Rabin,* No. 14-2646-DDC-GEB, 2016 WL 3615572, at *3 (D. Kan. July 6, 2016) ("The contested nature of th[e] suit, the engagement of a neutral mediator, and the extensive negotiation process constitute evidence that the parties negotiated the settlement agreement fairly and honestly.").

3.   *The Settlement Provides Adequate Relief for the Class and the Parties and their Counsel Believe the Settlement is Fair and Reasonable*

The Parties' proposed settlement provides more than adequate relief for the class. More specifically, under the proposed Plan of Allocation, even on a "straight" average, the total settlement award to a class member who worked for Defendant MMC is approximately $1,800.00, and the

average total settlement award to a class member who worked for Defendants HWS or HMVG is approximately $575.00.[20] Ex. 2 at ¶ 87. But many class members who earned higher average hourly rates or worked a higher proportion of overtime will receive settlement awards several times higher than that average. *See id.* at ¶ 90. Moreover, the settlement already provides recovery at approximately 80-90% of the total, maximum estimated alleged damages for the class, and because the pro rata settlement shares in the Plan of Allocation are premised on Plaintiffs' counsel's admittedly aggressive damage calculations--the settlement awards likely exceed any true "best day in court" recovery that class members could potentially achieve were they to prevail on these claims. *Id.* at ¶¶ 92, 92.

Plaintiffs acknowledge that this proposed settlement includes a potential reversion of unclaimed settlement funds to Defendants, and that this Court has previously expressed concerns about a reversion provision in a proposed class action settlement in another case. *See Bailes v. Lineage Logistics, LLC,* No. 15-CV-02457-DDC-TJJ, 2016 WL 4415356, at *6 (D. Kan. Aug. 19, 2016). More specifically, in *Bailes,* the parties' proposed class action settlement of Federal Credit Report Act ("FCRA") claims included a provision stating that any settlement checks that were not negotiated by participating class members within 90 days of issuance would be cancelled, and the funds associated with those checks would revert to the defendant. *Id.* In its order denying preliminary approval of that proposed settlement, this Court noted that "[a]lthough a reversion provision is not prohibited per se…most courts strongly disfavor them," explaining further that "[r]eversion provisions prevent the

---

[20] The average settlement award to class members who worked for Defendant MMC is higher than the average settlement award to class members who worked for Defendants HWS and HMVG because class members who worked for Defendant MMC worked an average of approximately 79 workweeks during the Class Period, while class members who worked for Defendants HWS or HMVG worked an average of 20 weeks during the Class Period, and because the class members who worked for Defendant MMC have a higher average amount of alleged overtime damages than class members who worked for Defendants HWS or HMVG. Ex. 2. at ¶ 88. Because the average hourly rate of pay for class members who worked for Defendant MMC was $34.41, the average settlement payment to class members who worked for Defendant MMC equates to a little over 52 hours of pay at the average straight-time rate of $34.41. *Id.* And, when divided across the average of 79 workweeks these class members worked, the average settlement payment equates to payment for approximately 0.6 hours per workweek at the average hourly rate. *Id.* At the $45.37 average hourly rate of pay for class members who worked for Defendants HWS or HMVG, their average settlement payments equate to 12.7 hours of pay at a straight-time rate, and over the average of 20 workweeks this also equates to approximately 0.6 hours of pay per workweek. *Id.* at ¶ 89.

33

court from knowing the true value of a settlement and, more importantly, create the potential for undermining the rights of absent class members." *Id.* However, we also note the Court acknowledged that the conclusion it reached in that case, "did not mean that reversion is never permissible." *Id.* at *7.

In this case, Plaintiffs ask the Court to reach a different conclusion, and find the reversion provision in the parties' proposed settlement to be permissible. Several facts in this case, and in its proposed settlement terms, can be distinguished from the facts and settlement terms at issue in *Bailes*.[21] First, the proposed settlement of FCRA claims for the class in *Bailes* involved a potential per-class member recovery of $22.24, which this Court noted was significantly lower than the "best day in court" recovery class members could potentially achieve of $200 to $2,000 (depending on their success under two claims), and which was also meaningfully lower than other settlements of similar claims. *Id.* at *6. By contrast, the potential per-class member potential recovery under this settlement varies, but is in all instances is near to, if not likely in excess of, the true "best day in court" recovery that class members could potentially achieve were they to prevail on these claims. Ex. 2 at ¶¶ 91, 92. Second, Plaintiffs note the Court expressed concern about approving the *Bailes* settlement in part because under its terms, absent class members would release their claims even if their correct addresses were never located and they never received notice of the case. *Id.* at *7. But here, the class members at issue are all current or former employees of the Defendants, whereas the class members in *Bailes* were merely former applicants for employment with that defendant, and as such, the Defendants in this case are more likely than the defendant in *Bailes* was to have accurate mailing addresses and other contact information (including personal email addresses, which Defendants may possibly provide if

---

[21] While the parties' Settlement Agreement in this case also provides for reversion of any funds resulting from settlement checks that class members fail to negotiate within a certain amount of time (Ex. 1 at ¶ 46)—*i.e.* the same type of reversion over which the Court expressed reservations in *Bailes*—here, class members will have 180 rather than 90 days to negotiate their settlement checks.

practicable) to ensure that class members receive notice of the settlement and the opportunity to participate in the settlement.[22]

Third, unlike *Bailes,* in this case, the parties agreed that unclaimed settlement funds remaining at the end of the claims period will first be distributed on a *pro rata* basis to participating class members, and will, only revert (in part)[23] to Defendants if unclaimed settlement funds remain after the distributions described in Paragraph 39 of the Settlement Agreement occur. As other courts have noted, "reverter clauses are acceptable 'when class members receive full recovery for their damages and the parties agree to the reversion.'" *Childs v. Unified Life Ins. Co.*, No. 10-CV-23-PJC, 2012 WL 13018913, at *3 (N.D. Okla. Aug. 21, 2012) (quoting *McKinnie v. JP Morgan Chase Bank, N.A.,* 678 F.Supp.2d 806, 812 (E.D. Wisc. 2009)). Finally, Plaintiffs note another court within this district very recently approved a hybrid class and collective action settlement agreements with a similar provision. *See e.g. Florece,* 2021 WL 5042715 at *2 (approving settlement that provided for reversion to defendant of any unclaimed settlement funds resulting from class members failing to negotiate their settlement checks within 120 days).

      a.  The Costs, Risks, and Delay of Continued Litigation, Trial and Appeal Support the Settlement

This Rule 23(e)(2) factor overlaps with two of the *Rutter* factors—*i.e.* the existence of "serious questions of law and fact which might place the ultimate outcome of this action in dispute," and

---

[22] Moreover, in this case, class members will receive notice by U.S. Mail and will receive a reminder postcard if they do not submit a claim or opt-out request within 30 days, and under the terms of the Settlement Agreement, the Settlement Administrator will also obtain Social Security numbers from Defendants for any class members they cannot initially locate. See Ex. 1 at ¶ 25. And, in contrast to the *Bailes* agreement, in this case, class members who do not participate or who are not ultimately located and do not receive the notice will only release their claims under state law (and not any claims under the FLSA). *Id.* at ¶ 16.

[23] Plaintiffs also acknowledge this Court expressed reservation about the proposed *cy pres* provision in the *Bailes* settlement, but in contrast to the that case, here the proposed *cy pres* beneficiary—the HCA Hope Fund—is actually related to the nature of the class members' claims because it provides economic relief to nurses employed by HCA-affiliated employers. *See e.g McKeon v. Integrity Pizza LLC,* No. 18-CV-0932-WJM-KLM, 2020 WL 8679852, at *3 (D. Colo. Aug. 6, 2020) (approving . Domino's Partner's Foundation, a 501(c)(3) non-profit organization providing economic relief to delivery drivers, as *cy pres* recipient in hybrid wage and hour settlement with Domino's franchisees).

whether "the value of immediate recovery outweighs the possibility of any future relief." *Rutter,* 314 F.3d at 1188. *See also Chavez Rodriguez,* 2020 WL 3288059 at *3 (noting these factors "largely overlap and can be subsumed under Rule 23's requirement that the settlement agreement's adequacy be measured against the 'costs, risks, and delay of trial and appeal' of the underlying case) (quoting Fed. R. Civ. P. 23(e)(2)(C)(i)).

Here, there are serious issues of law and fact which could, if the case was further litigated, place the class members' ability to recover in jeopardy. *Id.* First, if Defendants were to prevail on the LMRA preemption issue, the 574 class members who were employed by Defendant MMC would be precluded from seeking, or ultimately recovering any alleged straight time damages. *See* Ex. 2 at ¶ 93. Additionally, since Plaintiffs' counsel's damage calculations reflect that 164 of these class members *only* have alleged straight time damages during the Class Period, the loss of these claims would essentially foreclose the possibility of any recovery for nearly 30% of the class cohort employed by Defendant MMC. *Id.* at ¶ 94. Moreover, under Plaintiffs' counsel's damage modeling, alleged straight time damages comprise nearly 60% of the total settlement awards for class members who worked for Defendant MMC; the loss of these claims would significantly reduce the total amount of alleged damages this class cohort could potentially seek. *Id.* at ¶ 95.

Second, because the statute of limitations continues to run on an individual's FLSA claims until he/she/they files a written consent to join a lawsuit (*see* 29 U.S.C. §216(b)), and because the Plaintiffs' allegations and theory of violation center around a Defendants' alleged practices occurring prior to March 2019, the Parties' agreement as to a Class Period of July 3, 2016 through February 28, 2019 allows class members to potentially recover alleged damages from claims that they might otherwise be unable to pursue. *Id.* at ¶ 96. Absent an order granting equitable tolling, class members who wish to assert FLSA claims related to any alleged violations which occurred within the temporal scope of the agreed Class Period may be barred from doing so. *Id.* Given the risks associated with the

extant serious issues of law and fact, the value of the immediate recovery provided to the class by the proposed settlement also outweighs any potential future recovery.

Lastly, with respect to the costs of ongoing litigation, were the parties to continue litigating this matter, Defendants would likely face more costly and time-consuming discovery obligations, including additional searches for, and production of electronically stored information regarding the class members and Defendants' personnel who are allegedly responsible for, or otherwise knowledgeable about these time record edits. *Id.* at ¶ 97. Plaintiffs would similarly be faced with more onerous review and analysis of relevant time, time edit, and pay data for the class member and conducting depositions of Defendants' knowledgeable witnesses, and Plaintiffs would also likely face the additional expenses associated with engaging an economist or other expert witness(es). D. IAccordingly, these factors favor approval of the settlement.

  b. The Settlement's Proposed Plan of Allocation Treats Class Members Equitably Relative to One Another

As more fully detailed in Plaintiffs' counsel's declaration, the proposed Plan of Allocation for the settlement is predicated on counsel's damage modeling, which takes relevant, distinguishing facts between and among the class members into account (such as their widely disparate rates of pay and differing potential to incur overtime), thus preventing the type of unintended inequitable result that could occur if, for example, counsel had simply decided to allocate settlement shares to class members based solely on the number of workweeks they worked during the Class Period (and without consideration of their varying rates of pay, *etc.* Ex. 2 at ¶ 66. Additionally, the Plan of Allocation distinguishes between alleged straight time and alleged overtime damages. *Id.* at ¶ 67. *See also Cisneros v. EP Wrap-It Insulation, LLC,* No. CV 19-500 GBW/GJF, 2021 WL 2953117, at *9 (D.N.M. July 14, 2021) (noting considerations for this factor include "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of

relief.") (quoting Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.)[24] The proposed Plan of Allocation for this settlement treats class members fairly and equitably relative to one another, and thus, this factor also favors settlement.

### c.   The Proposed Claims Process is Straightforward and Uncomplicated

While the Court arguably cannot fully evaluate the "effectiveness" of the settlement's proposed method for claims until after the claims process has been completed, at this juncture, Plaintiffs assert that they purposefully attempted to design a claims process that would *not* effectively discourage participation due to unnecessarily complicated or rigid requirements. Ex. 2 at ¶ 82. Rather, class members will be able to submit claims forms to the Settlement Administrator by mail, by email, or through a dedicated claims website operated by the Settlement Administrator. *Id.* As class members will also be receiving the Notice and Claim Form by U.S. Mail, and will receive a reminder postcard if they do not respond within 30 days, Plaintiffs are confident that this claims process will not unduly burden class members or discourage their participation. *Id.*

### d.   The Terms of the Proposed Award of Attorneys' Fees

The relevant facts and authority supporting the reasonableness of the attorneys' fees award Plaintiffs seek as a part of this settlement are set forth in Plaintiffs' forthcoming Unopposed Motion for Approval of Attorneys' Fees and Costs and Class Representative Service Awards.[25]

### D.  Preliminary Approval of the Settlement is Also Appropriate Under the FLSA

---

[24] Finally, as another court within this district has noted, "[a]s a general rule, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." *Hershey v. ExxonMobil Oil Corp.,* No. 07-1300-JTM, 2012 WL 5306260, at *3 (D. Kan. Oct. 26, 2012), *aff'd in part,* dismissed in part, 550 F. App'x 566 (10th Cir. 2013) (quoting *Law v. National Collegiate Athletic Ass'n*, 108 F.Supp.2d 1193, 1196 (D.Kan. 2000)). The proposed Plan of Allocation here takes into consideration the extent of class members' alleged "injuries," in the allocation of funds.

[25] Plaintiffs acknowledge this is also a factor considered by the Court when determining whether to approve a settlement under the FLSA; Plaintiffs' forthcoming motion will similarly address the relevant arguments and authorities for consideration in approving FLSA settlements. Notwithstanding Plaintiffs' reliance on the arguments advanced, and authorities relied upon therein, Plaintiffs note that Courts within this district regularly approve attorneys' fees in common fund settlements in an amount equal to 30% or more of the total settlement. *See e.g.* Koehler v. Freightquote.com, Inc., No. 12-2505-DDC-GLR, 2016 WL 3743098, at *9 (D. Kan. July 13, 2016) (awarding attorneys fees equal to one third of the gross settlement amount).

In considering whether to approve an FLSA settlement, the court must decide whether: "(1) the litigation involves a bona fide dispute, (2) the proposed settlement is fair and equitable to all parties, and (3) the proposed settlement contains an award of reasonable attorneys' fees." *Flerlage v. US Foods, Inc.*, 2020 WL 6318662, at *1 (D.Kan. Oct. 28, 2020) (citing *Barbosa,* 2015 WL 4920292 at *5).

### 1.   *The Case Involves a Bona Fide Dispute*

A party seeking approval of an FLSA settlement must submit sufficient information for the court to conclude that a *bona fide* dispute exists. *Flerlage,* 2020 WL 4673155 at *9. To do so, courts within this district typically require the moving party to provide:

> (1) a description of the nature of the dispute, (2) a description of the employer's business and the type of work performed by the employees, (3) the employer's reasons for disputing the employees' right to a minimum wage or overtime, (4) the employees' justification for the disputed wages, and, (5) if the parties dispute the computation of wages owed, each party's estimate of the number of hours worked and the applicable wage.

*Id.* In Sections II.A.-II.D, *supra,* Plaintiffs have provided the Court with each of these requisite categories of information. Accordingly, Plaintiffs respectfully request the Court find that this case involves a *bona fide* dispute under the FLSA.

### 2.   *The Settlement is Fair and Equitable to All Parties*

"[A]n FLSA settlement must provide adequate compensation to the employee and must not frustrate the FLSA policy rationales." *Pliego*, 313 F.R.D. at 130. Notably, in this district, when determining whether a proposed FLSA settlement is fair and equitable, courts examine the factors applicable in the Rule 23(e) settlement approval context. *See e.g. Elston*, 2020 WL 2473542, at *4. In the interest of brevity and efficiency, Plaintiffs refer to, and incorporate the arguments and authorities in Sections III.C.1-III.C.3(d), *supra,* as if fully stated here.

### E.  The Court Should Approve the Proposed Notice, Direct the Issuance of Notice to the Settlement Class and Appoint Cornerstone Law Firm as Class Counsel

When a class is certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). More specifically, "in easily understood language," this notice must "clearly and concisely state" the eight categories of information enumerated in Fed. R. Civ. P. 23(c)(2)(B). Highly summarized, this includes information about the class definition and nature of the action and the class claims or defenses at issue, and it must also apprise class members: that they may enter an appearance through an attorney at their option; that they may request to be excluded from the class, and the time and manner for making any such request, and the binding effect of a class judgment on them. *Id.* With respect to conditional certification of collective actions under the FLSA, the court "has the power and duty to ensure that the notice is fair and accurate, but it should not alter plaintiff's proposed notice unless such alteration is necessary." *Christeson v. Amazon.com.ksdc, LLC, No.* 18-2043-KHV, 2019 WL 2137282, at *4 (D. Kan. May 16, 2019). Finally, within the settlement context, Rule 23(e) also requires the court to "direct notice in a reasonable manner to all class members who would be bound by the [proposed settlement]" after granting preliminary approval. Fed. R. Civ. P. 23(e)(1)(B).

As noted in the advisory committee's note to the 2018 amendment of Rule 23(c)(2), courts commonly direct "notice to the class simultaneously under both Rule 23(e)(1) and Rule 23(c)(2)(B), including a provision for class members to decide by a certain date whether to opt out." Fed. R. Civ. P. 23(c)(2), advisory committee's note to the 2018 amendment. Where, as here, no class was certified prior to settlement, notice to the class must comply with the requirements of both Rule 23(e)(1) and Rule 23(c)(2)(B). *See e.g. Florece,* 2021 WL 5042715, at *12. And where class members are identifiable, individual notice "is not a discretionary consideration that can be waived in a particular case; rather, it is an unambiguous requirement of Rule 23." *Better v. YRC Worldwide, Inc.,* No. 11-2072- KHV, 2015 WL 566962, at *3 (D. Kan. Feb. 11, 2015) (quotations omitted).

Here, the proposed Notice properly apprises class members of all requisite categories of information under Rule 23(c)(2)(B), and also includes the information relevant to Rule 23(e)(5) regarding class member objections. *See* Ex. B. to Ex. 1 at 1, 5-6. The Notice also provides a sufficient length of time—*i.e.* 45 days—for class members to submit objections. *See e.g. Florece,* 2021 WL 5042715, at *12 (finding 45 days to be a sufficient amount of time for class members to weigh options and submit objections). Finally, the Notice includes Plaintiffs' counsel's information, and will be individually sent to class members by the Settlement Administrator through U.S. Mail, using addresses and contact information provided by Defendants. As this Court has previously stated, "[i]ndividual mailed notice, when combined with contact information for plaintiffs' counsel, affords the 'best notice that is practicable under the circumstances.' " *Flerlage*, 2020 WL 4673155, at *7 (quoting Fed. R. Civ. P.. 23(c)(2)(B)). For these reasons, Plaintiffs request the Court approve the form and issuance of the proposed Notice.

**F. The Court Should Appoint Cornerstone Law Firm as Class Counsel and Schedule a Final Approval Hearing**

Finally, because an order certifying a class must also appoint class counsel who will fairly and adequately represent the interests of the class,[26] Plaintiffs respectfully request this Court appoint the undersigned and her co-counsel, Jessica M. McDowell of Cornerstone Law Firm as Class Counsel. *See* Fed. R. Civ. P. 23(c)(1)(B) & (g). Finally, Plaintiffs respectfully request the Court grant all the relief requested herein and schedule a Final Approval Hearing for this settlement.

---

[26] Relevant information regarding the work counsel has done in identifying or investigating potential claims in this action, their class and collective action experience and resulting experience and knowledge of the FLSA and state wage and hour laws, and the resources counsel can, and will commit to representing the class can be found in counsel's declarations. *See* Ex. 2, Paulus Dec. at ¶¶98-105.; Ex. 9, McDowell Dec. at ¶¶ 6-23.; *see also* Fed. R. Civ. P. 23(g)(1)(A)

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 18th day of January, 2022, a true and accurate copy of the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


 /s/ M. Katherine Paulus

Attorney for Plaintiff