## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**TAMMIE MARQUEZ, et al.,** *on behalf*
*of themselves and all others similarly*
*situated,*

        **Plaintiffs,**

**v.**

**MIDWEST DIVISION MMC, LLC, et al.,**

        **Defendants.**

**Case No. 19-2362-DDC-ADM**

## MEMORANDUM AND ORDER

Plaintiffs are registered nurses (RNs) who worked for entities affiliated with HCA

Healthcare.  They have sued four entities:  (1) Midwest Division-MMC, LLC (an entity who

owns and operates Menorah Medical Center); (2) HealthTrust Workforce Solutions, LLC (a

staffing company who provides RNs to various hospitals and healthcare facilities, including

Menorah); (3) Health Midwest Ventures Group, Inc. (an entity who used to operate the Market

Resource Float Pool—a pool of RNs who served various affiliates in the Kansas City area); and

(4) Health Midwest Medical Group, Inc. (who, defendants contend, plaintiffs named in this

lawsuit by mistake).  Plaintiffs bring class and collective action claims against defendants for

unpaid compensation and related penalties and damages under the Fair Labor Standards Act

(FLSA), 29 U.S.C. §§ 201–19, and the Kansas Wage Payment Act (KWPA), Kan. Stat. Ann. §§

44-313–44-327.  Doc. 27 at 13–17, 19–22 (Second Am. Compl. ¶¶ 68–94, 106–124).  Also,

plaintiffs assert class action claims for unjust enrichment and quantum meruit claims under

Kansas common law.  *Id.* at 17–19 (Second Am. Compl. ¶¶ 95–105).

After the parties engaged in informal and formal discovery and engaged the services of a third-party neutral mediator, they reached an agreement to settle this action on a hybrid Rule 23 class and FLSA collective action basis.  Plaintiffs have filed:  (1) an Unopposed Motion for Order Certifying Class and Collective Action for Purposes of Settlement, Preliminarily Approving Class and Collective Action Settlement, Directing Notice to the Class, Appointing Class Counsel, and Scheduling Final Approval Hearing (Doc. 93), and (2) an Unopposed Motion for Approval of Attorneys' Fees Award, Litigation Costs, Settlement Administrator and Class Representative Service Awards (Doc. 98).  They ask the court to enter an Order (1) certifying plaintiffs' class and collective action claims for purposes of settlement, (2) preliminarily approving the parties' proposed class and collective action settlement, (3) approving the form and manner of notice, (4) appointing class counsel, (5) scheduling hearing date for final settlement approval, and (6) approving an attorneys' fee award, litigation costs, settlement administrator fees, and class representative service awards.

For reasons explained below, the court grants in part plaintiffs' Unopposed Motion for Order Certifying Class and Collective Action for Purposes of Settlement, Preliminarily Approving Class and Collective Action Settlement, Directing Notice to the Class, Appointing Class Counsel, and Scheduling Final Approval Hearing (Doc. 93), and also denies the motion in part.  Specifically, the court grants the request to certify a Rule 23 class and FLSA collective action for settlement purposes.  Also, the court grants the request to appoint class counsel.  But, the court denies without prejudice to refiling the motion to approve preliminarily the parties' proposed settlement, direct notice to the class, and schedule a Final Approval Hearing.

Also, the court denies without prejudice to refiling plaintiffs' Unopposed Motion for Approval of Attorneys' Fees Award, Litigation Costs, Settlement Administrator and Class

Representative Service Awards (Doc. 98).  The court denies without prejudice the portion of the motion seeking to approve the service awards because the Settlement Agreement includes an agreement by defendants not to contest the amount of the service awards in exchange for the named plaintiffs' agreement to an overly broad and general release of all claims against defendants.  And, the court denies without prejudice the portion of the motion seeking approval of attorneys' fees, litigation costs, and Settlement Administrator costs.  That request is premature.

The court explains how it reaches these conclusions, below.

## I.    Factual Background

Three named plaintiffs bring this action on behalf of themselves and others similarly situated.  They are:  (1) plaintiff Tammie Marquez, who used to work as an RN for defendants HealthTrust Workforce Solutions, LLC and Health Midwest Ventures Group, Inc.; (2) plaintiff Neesha Perez, who used to work as an RN for defendants HealthTrust Workforce Solutions, LLC and Health Midwest Ventures Group, Inc.; and (3) plaintiff Josiah Chumba, who used to work as an RN at Menorah Medical Center, but was directly employed by defendant Midwest Division-MMC, LLC.  Doc. 94-2 at 2 (Paulus Decl. ¶¶ 5–6).  Plaintiffs Marquez and Perez seek to serve as representative plaintiffs for a putative class of similarly-situated RNs who worked for defendant HealthTrust Workforce Solutions, LLC and defendant Health Midwest Ventures Group, Inc. at Menorah Medical Center during the relevant time period.  *Id.* at 2 (Paulus Decl. ¶ 5).  And, plaintiff Chumba seeks to serve as the representative plaintiff for a putative class of

similarly situated RNs who defendant Midwest Division-MMC directly employed during the relevant time period.[1] *Id.* at 2 (Paulus Decl. ¶ 6).

The crux of the Second Amended Complaint's allegations asserts that defendants failed to compensate plaintiffs, and other similarly situated employees, for all the time they worked during their employment.  Specifically, plaintiffs allege that defendants edited their time records by entering a computerized system that tracks the exact times that employees clock-in and clock-out of work and changing the clock-in and clock-out times to reflect—inaccurately—that employees had worked less time than they actually had worked.  Doc. 27 at 11 (Second Am. Compl. ¶¶ 55–56).  Plaintiffs assert that defendants made these changes to their time records, as well as other similarly situated employees' time records, thereby producing time records that reflect inaccurate clock-in, clock-out, and lunch break times.  *Id.* (Second Am. Compl. ¶ 57).  And, plaintiffs allege, as a result of defendants' practice of changing employee time records, defendants have failed to compensate plaintiffs and other similarly situated employees properly for all of the time that they actually worked for defendants.  *Id.* at 11–12 (Second Am. Comp. ¶ 58).  Plaintiffs' Second Amended Complaint asserts that defendants' failure to pay them—and other similarly situated employees—for all hours that they worked violates the FLSA, KWPA, and Kansas common law.  *Id.* at 13, 17–19 (Second Am. Compl. ¶¶ 67, 95–105).  Defendants filed separate Answers to plaintiffs' Second Amended Complaint, denying plaintiffs' allegations. *See* Docs. 30, 31, 32, 33.

With their motion seeking settlement approval, plaintiffs provide more detailed information about defendants' alleged timekeeping practices and policies.  They assert that

---

[1]     RNs who Midwest Division-MMC directly employed are subject to the terms of a Collective Bargaining Agreement (CBA) between Menorah and Nurses United for Improved Patient Care, CAN/NNOC, AFL-CIO (the Union).  Doc. 94-2 at 2 (Paulus Decl. ¶ 6).

defendants maintained a timeclock rounding practice where the timeclock system automatically rounds hourly employees' clock-in and clock-out times to the nearest quarter hour.  Doc. 94-2 at 3 (Paulus Decl. ¶ 10).  For example, if a nurse clocked in at 6:38 a.m., the nurse's clock-in time automatically rounded forward to 6:45 a.m.  But if the nurse clocked in at 6:37 a.m., the nurse's clock-in time automatically rounded back to 6:30 a.m.  *Id.*  Plaintiffs allege that defendants' employees regularly adjusted their clock-in and clock-out times to prevent rounding in their favor.  *Id.* (Paulus Decl. ¶ 11).  Plaintiffs assert that, although defendants' respective policies each prohibit hourly employees from clocking-in more than three to five minutes before the start of a shift, *id.* (Paulus Decl. ¶ 12), defendant never enforced these policies and never disciplined plaintiffs for clocking-in earlier than five minutes before the start of a shift, Doc. 94-6 at 6 (Marquez Dep. 79:22–80:18).

Also, plaintiffs assert that defendants HealthTrust Workforce Solutions, LLC and Health Midwest Ventures Group, Inc. expected hourly employees, including RNs like plaintiffs Marquez and Perez, to take a 30-minute unpaid meal break each shift that they worked, and included this requirement in their respective Employee Handbooks.  Doc. 94-2 at 4 (Paulus Decl. ¶ 13).  But, defendant Midwest Division-MMC, LLC's Employee Handbook provided that non-exempt employees are "encouraged" to take meal periods only when "patient care needs" permit, and that the meal period, if taken, must be at least "thirty (30) consecutive minutes in duration." *Id.* (Paulus Decl. ¶ 14).  Also, defendant Midwest Division-MMC, LLC's Employee Handbook required non-exempt employees to clock-in and clock-out for an uninterrupted meal period, and stated that employees bear the responsibility to notify their managers of an interrupted meal period.  *Id.*  Both defendants HealthTrust Workforce Solutions, LLC and Health Midwest Ventures Group, Inc. published language in their respective Employee Handbooks requiring

hourly employees to ensure the accuracy of their time records and promptly report any errors or omissions. *Id.* (Paulus Decl. ¶ 15). But, plaintiffs allege defendants never provided them with the means to review their time records during the Class Period. *Id.*

Defendants deny plaintiffs' allegations that their time-keeping practices violated federal or Kansas law. *See generally* Docs. 30, 31, 32, 33 (defendants' Answers). Also, defendants assert that Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, preempts the Kansas state law claims asserted by RNs employed by defendant Midwest Division-MMC, LLC because their employment is subject to the terms of a CBA. *See* Doc. 94-2 at 26 (Paulus Decl. ¶ 93).

## II.     Procedural Background

On July 3, 2019, plaintiffs filed this lawsuit. Doc. 1. The case proceeded to discovery, but faced some delays due to the COVID-19 pandemic. Still, the parties conducted extensive written discovery, serving Fed. R. Civ. P. 26(a)(1) initial disclosures and amended and supplemental disclosures. Docs. 18, 49, 53. Also, the parties served and responded to interrogatories and requests for production of documents. Docs. 35, 36, 45–48, 52, 58, 65. Defendants took depositions of the three named plaintiffs in January 2021. Docs. 61–63. Plaintiffs noticed and began to prepare for the deposition of defendants' Human Resources Director on February 16, 2021. Doc. 66. But, the deposition never occurred because the parties asked—and the court granted their request—to stay the case pending mediation. *See* Docs. 71, 72.

In April 2021, the parties mediated the case with an experienced and neutral mediator. Doc. 94-2 at 20 (Paulus Decl. ¶¶ 71, 73). At the mediation, the parties reached a settlement in principle for the total, maximum amount of a Global Settlement Fund. *Id.* at 20 (Paulus Decl. ¶

73).  But, they still needed to resolve some of the material terms of the settlement before finalizing a settlement agreement.  *Id.*  The parties tried to negotiate those terms through written correspondence.  *Id.* at 21 (Paulus Decl. ¶ 74).  But, they came to an impasse on some of the terms.  *Id.* (Paulus Decl. ¶ 76).  So, the parties reengaged the mediator's services for a second mediation on October 27, 2021.  *Id.*  The parties resolved most of the disputes at the second mediation, and afterward, they continued their settlement negotiations until they agreed to the terms memorialized in the parties' Settlement Agreement (Doc. 96-1).

Now, plaintiffs ask the court for preliminary approval of the parties' Settlement Agreement.  Specifically—as discussed above—plaintiffs move the court to enter an Order (1) certifying plaintiffs' class and collective action claims for purposes of settlement, (2) preliminarily approving the parties' proposed class and collective action settlement, (3) approving the form and manner of notice, (4) appointing class counsel, (5) scheduling a hearing date for final settlement approval, and (5) approving an attorneys' fee award, litigation costs, settlement administrator fees, and class representative service awards.  The court addresses these requests, below.

## III.    Legal Standard

"Court approval is required to settle both Rule 23 class actions and FLSA claims." *Florece v. Jose Pepper's Rests, LLC*, No. 20-2339-ADM, 2021 WL 5038773, at *2 (D. Kan. Oct. 29, 2021) (first citing *Pliego v. Los Arcos Mexican Rests., Inc.*, 313 F.R.D. 117, 127–28 (D. Colo. 2016); then citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982); and then citing Fed. R. Civ. P. 23(e)).  "Where, as here, the court has not yet certified an FLSA collective action or a Rule 23 class action, the court must first consider certification

before addressing the proposed settlement." *Id.* (citing *Flerlage v. US Foods, Inc.*, No. 18-2614-DDC-TJJ, 2020 WL 4673155, at *2–*4, *8 (D. Kan. Aug. 12, 2020)).

## IV.    Analysis

As the governing legal standard requires, the court first must consider Rule 23 and FLSA certification before deciding whether to approve the proposed settlement of class and collective action claims. *See id.* So, the court first addresses plaintiffs' request to certify their class and collective action claims for purposes of settlement.

### A.  Class and Collective Action Certification

Plaintiffs ask the court to certify under Rule 23 a KWPA settlement-only class defined as, "all hourly Registered Nurses who performed work for Defendants at Menorah Medical Center between July 3, 2016 and February 28, 2019." Doc. 94 at 20. Also, plaintiffs ask the court to certify conditionally a settlement-only class under 29 U.S.C. § 216(b) of the FLSA. They propose a putative class defined as, "all hourly Registered Nurses who performed work for Defendants at Menorah Medical Center between July 3, 2016 and February 28, 2019." *Id.* The court first addresses the request for Rule 23 certification, and then it addresses the request to certify conditionally the FLSA collective action.

### 1.  Rule 23 Certification

"Class action settlements are premised upon the validity of the underlying class certification." *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1261 (10th Cir. 2004). Class certification is appropriate if the district court finds, after conducting a "rigorous analysis," that the proposed class satisfies the requirements of Fed. R. Civ. P. 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (citation and internal quotation marks omitted). "Confronted with a request for settlement-only class certification, a district court need not inquire whether the

case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (citing Fed. R. Civ. P. 23(b)(3)(D)). "But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Id.*

The elements of class certification are (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation, plus one of the requirements of Rule 23(b)(1) through (3). Fed. R. Civ. P. 23. Plaintiffs seek certification under Rule 23(b)(3). Doc. 94 at 24–26. That subsection of Rule 23 requires plaintiffs to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The court addresses each of these Rule 23 requirements, below.

### a. Numerosity

Rule 23(a)(1) requires plaintiffs to show that "the class is so numerous that joinder of all members is impracticable[.]" Numerosity "requires examination of the specific facts of each case and imposes no absolute limitations." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 292 F.R.D. 652, 667 (D. Kan. 2013). A plaintiff seeking class certification "must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved." *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 504 (D. Kan. 2014).

Here, plaintiffs allege the numerosity element is met because defendants' records reflect that the putative class consists of 843 putative class members (Doc. 94-2 at 2 (Paulus Decl. ¶ 8)), and that number is enough to make joinder impracticable. "[N]umerosity does not require

plaintiffs to establish the precise number of class members, only that the class is sufficiently numerous." *Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 608 (D. Kan. 2014). In *Nieberding*, this court found that plaintiffs had satisfied the numerosity requirement when the parties stipulated 233 persons belonged to the class. *Id.* Also, another judge in our court has found that a class with more than 500 members "is generally considered so numerous that joinder would be impractical." *Florece*, 2021 WL 5038773, at *3. For the same reasons, plaintiffs here satisfy the numerosity requirement by identifying passages in defendants' records showing the class consists of 843 putative class members.

### b. Commonality

Rule 23(a)(2) requires plaintiffs to show "questions of law or fact common to the class[.]" Commonality requires plaintiffs "to demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 350 (citation and internal quotation marks omitted). In other words, the "claims must depend upon a common contention" that is "of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation and internal quotation marks omitted).

Here, plaintiffs assert that questions of law or fact common to the class exist for several reasons. They explain that the same time and pay policies applied to all putative class members. They assert that several questions of fact are common to the putative class members' claims. These include, plaintiffs assert, (a) whether defendants accurately paid putative class members all of their wages due for the hours worked; and (b) whether defendants' employees changed

putative class members' time records to reflect inaccurately that they worked less time than they actually worked which, in turn, resulted in defendants paying putative class members less than they were owed for their time worked.  And, plaintiffs contend, these common questions of fact lead to the common question of law—*i.e.*, whether defendants violated the KWPA with their time keeping practices.  The court agrees.  The alleged non-payment for time worked is a common issue for all members of the putative class.  *See Florece*, 2021 WL 5038773, at *3 (holding that whether named plaintiff "can show that defendants' policies violated" the Missouri Minimum Wage Law would "resolve an issue central to all [putative class members'] claims"). Plaintiffs' ability to prove a violation of law occurred is common to all putative class members' claims.  It will provide a common answer to that question and drive the litigation's outcome. Therefore, plaintiffs satisfy the commonality requirement.

### c.   Typicality

Rule 23(a)(3) requires that plaintiffs' claims are typical of the class they seek to represent.  *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010).  The test of typicality is whether "all class members are at risk of being subjected to the same harmful practices, regardless any class member's individual circumstances."  *Id.* at 1199.

Here, plaintiffs assert that the representative plaintiffs' claims typify the claims of the other class members because they arise from the same alleged time-keeping practices committed by all defendants and rest on the same legal theories—*i.e.*, violation of the KWPA.  The court agrees.  Plaintiffs' legal and remedial theories are identical to those of the putative class, so plaintiffs satisfy the typicality requirement.

### d.   Adequacy of Representation

Rule 23(a)(4) requires named plaintiffs to show that "the representative parties will fairly and adequately protect the interests of the class."  Determining adequacy of representation turns on two questions:  (1) "whether named plaintiffs and their counsel have any conflicts of interest with other class members" and (2) whether the named plaintiffs and their counsel "will vigorously prosecute the action on behalf of the class." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 292 F.R.D. at 671.  "Minor conflicts among class members do not defeat certification; to defeat class certification, a conflict must be 'fundamental' and go to specific issues in controversy." *Id.* (quoting *Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253, 260 (D. Kan. 2010) (further citations omitted)).  "A fundamental conflict exists where some class members claim to have been harmed by conduct which resulted in benefit to other class members." *Id.*

Here, plaintiffs assert, this adequacy of representation test is met because they all are members of the class they seek to represent and sustained the same alleged injuries as putative class members. *See* Doc. 94-2 at 2 (Paulus Decl. ¶¶ 5–6).  Also, plaintiffs—represented by qualified counsel—have prosecuted this action vigorously to date.  And, no conflicts exists that would make named plaintiffs or their counsel inadequate.  So, the court finds that the adequacy factor is satisfied.

### e.   Rule 23(b)(3) Requirements

In addition to the requirements under Rule 23(a), a plaintiff must demonstrate that the class satisfies the requirements for one of the types of class actions listed in Rule 23(b).  Here, plaintiffs seek class certification under Rule 23(b)(3).  To certify a class under Rule 23(b)(3), plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

23(b)(3).  Factors "pertinent to these findings" are:

> (A)     the class members' interests in individually controlling the prosecution or
>         defense of separate actions;
> (B)     the extent and nature of any litigation concerning the controversy already
>         begun by or against class members;
> (C)     the desirability or undesirability of concentrating the litigation of the
>         claims in the particular forum; and
> (D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Plaintiffs contend that the common questions of fact and law predominate over any

questions affecting only individual members for reasons already described in the previous

paragraphs discussing Rule 23(a)(2)'s commonality requirement.  The court agrees.  Also,

plaintiffs argue that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy because plaintiffs' claims are substantially similar to those of the

putative class members, are premised on the same evidence, and rely on the same witnesses and

exhibits to support them.  The court agrees.  A class action is superior to litigating hundreds of

individual lawsuits involving the same factual and legal questions.

Also, all four of Rule 23(b)(3)'s factors favor certification.  *First*, class members have

little interest in individually controlling the prosecution of separate actions because the amount at

stake for each individual class member is small relative to the cost of maintaining a separate

action.  *Second*, the parties have not suggested any similar litigation and the court is unaware of

any.  *Third*, the class encompasses only nurses who worked at a single hospital location in

Kansas, and therefore, Kansas is an appropriate forum for the class.  *Fourth*, the parties haven't

identified—and the court isn't aware of—any difficulties that a class action likely will present.

For these reasons, the court finds that plaintiffs have satisfied the requirements for certification

of a Rule 23(b)(3) class action.  As a result, the court grants plaintiffs' motion for Rule 23 class certification of plaintiffs' KWPA claims for settlement purposes.

### f. Conclusion

Plaintiffs have satisfied the requirements of both Rule 23(a) and (b)(3).  Thus, the court grants plaintiffs' request to certify a Rule 23 settlement-only class for their KWPA claims and defines that class as:  "all hourly Registered Nurses who performed work for Defendants at Menorah Medical Center between July 3, 2016 and February 28, 2019."  Doc. 94 at 20.  And, the court appoints plaintiffs Marquez, Perez, and Chumba as class representatives.

Also, Rule 23 requires the court to appoint class counsel when it certifies a class under the Rule.  Fed. R. Civ. P. 23(g).  When appointing class counsel, the court must consider:

  (i)     the work counsel has done in identifying or investigating potential claims
          in the action;
  (ii)    counsel's experience in handling class actions, other complex litigation,
          and the types of claims asserted in the action;
  (iii)   counsel's knowledge of the applicable law; and
  (iv)    the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).  Here, plaintiffs ask the court to appoint Mary Katherine Paulus and Jessica M. McDowell of Cornerstone Law Firm as class counsel.  They have submitted Declarations that show work they have done to identify and investigate potential claims in the action, establish their experience and qualifications to handle class and collective action lawsuits like this one, and describe the resources they already have committed and will continue to commit to representing the class.  *See* Doc. 94-2 at 27–30 (Paulus Decl. ¶¶ 98–105); *see also* Doc. 94-9 at 2–7 (McDowell Decl. ¶¶ 6–23).  Based on plaintiffs' submissions, the court finds that the Rule 23(g)(1)(A) criteria are satisfied.  So, the court appoints Mary Katherine Paulus and Jessica M. McDowell of Cornerstone Law Firm as class counsel.

## 2.  FLSA Conditional Collective Action Certification

Next, the court addresses plaintiffs' request to certify an FLSA collective action for

settlement purposes.  The FLSA allows an employee to bring a collective action on behalf of

other employees who are "similarly situated."  29 U.S.C. § 216(b).  The Tenth Circuit has

approved a two-step approach to certifying an FLSA collective action.  *Thiessen v. Gen. Elec.*

*Cap. Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001).  The first step requires a court to make an

initial notice stage determination, applying a relatively lenient standard.  *Id.* at 1102.  The first

stage of this two-stage approach requires "nothing more than substantial allegations that the

putative class members were together the victims of a single decision, policy, or plan."  *Id.*

(citation and internal quotation marks omitted).  This initial stage determination certifies the case

as a collective action for purposes of sending the opt-in notice to potential class members.  *Id.*

The second stage occurs, if necessary, usually on a party's motion, after discovery is complete.

*Id.* at 1102–03.  Then, the court determines whether the class should remain certified, or whether

the court should decertify the class under a stricter standard.  *Id.*

Here, plaintiffs assert that § 216(b)'s requirements are satisfied because the three

representative plaintiffs allege that they and other similarly situated RNs in the putative

settlement class were "victims" of defendants' alleged policy, plan, or practice of depriving them

overtime compensation for all hours they worked in excess of 40 hours per week.  Doc. 94 at 28.

They allege that they and other similarly situated employees lacked access to their electronic

time-keeping records, and thus, had no means for reviewing their time records for accuracy.  *Id.*

Also, they assert defendants made changes to their time records—as well as the time records of

other similarly situated RNs—so that the time records reflected that they had worked fewer hours

than they actually had worked.  *Id.* at 29.  And, because plaintiffs and other similarly situated

RNs had no opportunity to review their time records, they didn't know defendants had changed their time records.  Based on these assertions, and given the lenient standard applied to conditional certification, the court finds that plaintiffs have come forward with substantial allegations that putative class members were victims of single policy of defendants.  Thus, the court grants plaintiffs' request to certify conditionally an FLSA collective action.  The court certifies, conditionally, a settlement-only class under 29 U.S.C. § 216(b) of the FLSA and defines it as, "all hourly Registered Nurses who performed work for Defendants at Menorah Medical Center between July 3, 2016 and February 28, 2019."  Doc. 94 at 20.

### B.  Preliminary Approval of the Proposed Settlement

Next, the court addresses plaintiffs' request that the court approve preliminarily the parties' proposed class and collective action settlement.  The parties' Settlement Agreement includes an agreement by defendants to pay a maximum, total Global Settlement Fund of $1,800,000, to resolve this matter fully.  Doc. 96-1 at 5, 9 (Settlement Agreement ¶¶ 6, 18).  The Global Settlement Fund includes:  (1) all settlement awards to participating class members; (2) any service awards to the named plaintiffs that the court approves; (3) payment to plaintiffs' counsel for any amounts of attorneys' fees, expenses, and costs that the court approves; and (4) payment for settlement administration costs.  *Id.* at 5 (Settlement Agreement ¶ 6).  After deducting amounts for any approved service awards, attorneys' fees, and Settlement Administrator's fees and expenses from the Global Settlement Fund, the remaining funds will comprise the Net Settlement Fund.  *Id.* at 5–6 (Settlement Agreement ¶ 7).  The Net Settlement Fund will represent the amount available to distribute for the settlement class members' awards based on their KWPA class and FLSA collective action claims.  *Id.*

Plaintiffs seek—and defendants don't oppose—an attorneys' fee award amounting to 30% of the Global Settlement Fund. Doc. 94-2 at 21–22 (Paulus Decl. ¶ 78); *see also* Doc. 99 at 4 (Pls.' Unopposed Mot. for Approval of Att'ys' Fees Award, Litigation Costs, Settlement Administrator and Class Representative Service Awards). This proportion equals $540,000. Doc. 99 at 4. Also, plaintiffs ask the court to approve $2,100 litigation costs. Doc. 94-2 at 21–22 (Paulus Decl. ¶ 78); *see also* Doc. 99 at 12. And, plaintiffs ask the court to approve a total of $36,000 in service awards to the named plaintiffs ($18,000 to plaintiff Chumba, $11,000 to plaintiff Marquez, and $7,000 to plaintiff Perez). Doc. 94-2 at 22 (Paulus Decl. ¶ 79). Plaintiffs assert that they deserve these service awards as "recognition of the extensive amount of time these [p]laintiffs devoted to this litigation and their representation of the putative class, the reputational risk they each undertook by being [n]amed [p]laintiffs in this lawsuit, and the additional inconvenience and added stress associated with being [n]amed [p]laintiffs while working full-time as nurses during the COVID-19 pandemic." *Id.* Also, plaintiffs ask the court to approve setting aside $30,000 in Settlement Administrator costs. *Id.* at 22 (Paulus Decl. ¶ 80). They base this amount on the estimated total settlement administration and claims processing costs submitted by the settlement administrator who plaintiffs have selected. *Id.* The parties' Settlement Agreement provides that, if the court declines to approve any of the requested amounts for attorneys' fees or costs, Service Awards, or Settlement Administration costs, the parties must reallocate those amounts to the Net Settlement Fund for payment to participating class members via their settlement awards. Doc. 96-1 at 25 (Settlement Agreement ¶ 50).

The parties have agreed to a proposed Plan of Allocation. It would pay each class member a pro rata settlement share of designated FLSA Allocated Funds and designated KWPA Allocated Funds for their class cohort (which is determined based on the entity who employed

the class member).  Doc. 94-2 at 12 (Paulus Decl. ¶ 68).  The parties arrived at this proposed

Plan of Allocation based on a review by plaintiffs' counsel's of defendants' time records and

other aggregated data which counsel then used to formulate a damages calculation model for

settlement class members.  *Id.* at 10–18 (Paulus Decl. ¶¶ 36–63).  Specifically, plaintiffs' counsel

reviewed aggregated data for each class member specific to the Class Period, "including their

individual average hourly rates of pay (including shift differentials), total hours worked, total

workweeks, total number of shifts or typical length of shifts, and number of weeks in which they

had received overtime pay[,]" as well as the named plaintiffs' and sample class members' time

records that defendants produced during discovery.  *Id.* at 12 (Paulus Decl. ¶¶ 43–44).  And,

counsel used those data and records to formulate a damages model that estimates the frequency

of time adjustments that—in the opinion of plaintiffs' counsel—class members would have

experienced.  *Id.* (Paulus Decl. ¶ 44).  Plaintiffs' counsel adequately explains that counsel

formulated the damages model based on the aggregated data and sample time records—instead

of time records for every single class member—because "it would have been costly, labor-

intensive, and arduous for [d]efendants to produce full time entry, time edit, and pay data for all

class members in connection with this settlement," and also "it would have been . . . both

inefficient and arduous for [p]laintiffs' counsel to review and analyze all such records for

purposes of calculating estimated and alleged damages for all class members."  *Id.* at 11–12

(Paulus Decl. ¶¶ 40–41).  Based on counsel's review of the records and data, counsel "formed

the opinion that class members who regularly worked a high number of hours per week appeared

to be more likely to have a higher frequency of edits made to their time records than class

members who worked a lower number of hours per week."  *Id.* at 12–13 (Paulus Decl. ¶ 45).

Plaintiffs' counsel then used the data and records counsel had reviewed to build a damages calculation model that estimates the alleged damages for settlement class members. *Id.* at 15 (Paulus Decl. ¶ 54). Plaintiffs' counsel started by calculating "each class member's estimated proportion of alleged overtime versus alleged straight time damages by dividing the total number of workweeks they worked during the Class Period by the number of workweeks in which [d]efendants' records reflect that they earned overtime." *Id.* Next, counsel "applied that proportion to the total estimated number of shifts each class member worked during the class period to identify the number of estimated 'overtime' versus 'straight time' shifts." *Id.* Then, to account for variations in the frequency of edits (which, as already discussed, plaintiffs' counsel identified in her review of records and concluded that the frequency correlated with the amount of time that the class member worked), plaintiffs' counsel "categorized each class member into an estimated edit frequency 'tier' for purposes of applying an associated multiplier intended to approximate the estimated frequency of edits to that class member's time records." *Id.* at 15–16 (Paulus Decl. ¶ 55). Next, plaintiffs' counsel "applied the applicable frequency multiplier to the total number of shifts categorized as 'straight time' shifts, as well as the total number of shifts categorized as 'overtime shifts' for each class member to identify the number of shifts in each category which [the parties] estimate as likely to be impacted by time record edits" which the parties call the "estimated impacted shifts[.]" *Id.* at 17 (Paulus Decl. ¶ 61). Then, plaintiffs' counsel "calculated an amount equaling 30 minutes of pay at the class members' individual, average straight time rates for each of these . . . estimated impacted shifts categorized as 'straight time' shifts during the Class Period" to determine the "estimated straight time damages[,]" and "if applicable, an amount equaling 30 minutes of pay at the class member's individual overtime rate for each of their estimated impacted shifts categorized as 'overtime' shifts" to determine the

"estimated overtime damages[.]"  *Id.*  Next, plaintiffs' counsel calculated liquidated damages amounts and added those liquated damages amounts to each class member's estimated straight time damages and estimated overtime damages "to determine their total, liquidated damages under the KWPA and the FLSA, respectively."  *Id.* (Paulus Decl. ¶ 62).

Using the damages calculation model crafted by plaintiffs' counsel, counsel estimates that class members who worked for defendant Midwest Division-MMC, LLC had a total of about $642,000 in alleged straight time damages and $476,000 in alleged overtime damages.  *Id.* at 18 (Paulus Decl. ¶ 63).  And, using the same damages calculation model, plaintiffs' counsel calculated that class members who worked for defendants HealthTrust Workforce Solutions, LLC and Health Midwest Ventures Group, Inc. had a total of about $151,000 in alleged straight time damages and $49,000 in alleged overtime damages.  *Id.*

Plaintiffs' counsel then used the estimated damages calculations to formulate a proposed Plan of Allocation that takes into account relevant and differing facts among the class members. *Id.* at 18 (Paulus Decl. ¶¶ 64–65).  The proposed Plan of Allocation divides and designates portions of the Net Settlement Fund for settlement awards for alleged straight time damages under the KWPA ("KWPA Allocated Funds") and alleged overtime damages under the FLSA ("FLSA Allocated Funds").  *Id.* at 18 (Paulus Decl. ¶ 65).  Then, the Plan of Allocation calculates an individual class member's pro rata settlement amount "by first dividing each class member's individual estimated straight time and estimated overtime damages by the total amounts of each category of alleged damages for their class cohort, and then multiplying that number by the total number of designated KWPA Allocated Funds, and FLSA Allocated Funds, respectively."  *Id.* at 19 (Paulus Decl. ¶ 68).  The parties calculate that the Proposed Plan of Allocation produces an average total settlement award of about $1,800 for class members who

worked for defendant Midwest Division-MMC, LLC and an average total settlement award of about $575 for class members who worked for defendants HealthTrust Workforce Solutions, LLC and Health Midwest Ventures Group, Inc.  *Id.* at 24 (Paulus Decl. ¶ 87).  And, the parties assert that the proposed Plan of Allocation produces settlement awards ranging from about 80–90% of class members' total, estimated alleged damages—including liquidated damages—as calculated by counsel.  *Id.* at 25 (Paulus Decl. ¶ 91).  Also, the Plan of Allocation provides that any class member with estimated alleged damages resulting in a pro rata settlement share of less than $20 automatically will receive a minimum settlement award recovery of $20.  *Id.* at 20 (Paulus Decl. ¶ 70).

To prevent participating class members from receiving a windfall from redistributing unclaimed settlement funds, the parties have agreed to cap any reallocation or redistribution of unclaimed settlement funds to an amount not exceeding "a certain percentage of class members' individual, total alleged liquidated, overtime and/or alleged straight time damages" as plaintiffs' counsel has calculated.  *Id.* at 23 (Paulus Decl. ¶ 83); *see also* Doc. 94-1 at 19–20 (Settlement Agreement ¶ 39).  After that, the parties have agreed to distribute 50% of any remaining amounts of unclaimed settlement funds to *cy pres* recipient, the HCA Hope Fund, which is "a 501(c)(3) organization that provides emergency funds to employees of hospitals, medical facilities, and other entities affiliated with HCA Healthcare (such as Menorah) when significant hardships arise due to illness, injury, natural disasters or other difficult situations that impact employees' essential needs."  Doc. 94-2 at 24 (Paulus Decl. ¶¶ 85–86).  And, the parties have agreed that the remaining 50% of unclaimed settlement funds will revert to defendants.  *Id.* (Paulus Decl. ¶ 85).

Having provided an overview of the parties' proposed class and collective action settlement, including their proposed Plan of Allocation of the Net Settlement Funds, the court

evaluates whether preliminarily approving the proposed settlement comports with Rule 23 and the FLSA.  The court first addresses the requirements for approving the FLSA settlement preliminarily.

### 1.   Preliminary Approval of FLSA Settlement

When parties settle FLSA claims, they must present the settlement to the court to review and decide whether the putative settlement is fair and reasonable.  *Tommey v. Comput. Scis. Corp.*, No. 11-CV-02214-EFM, 2015 WL 1623025, at *1 (D. Kan. Apr. 13, 2015); *see also Gambrell v. Weber Carpet, Inc.*, No. 10-2131-KHV, 2012 WL 5306273, at *2 (D. Kan. Oct. 29, 2012) ("When employees file suit against their employer to recover back wages under the FLSA, the parties must present any proposed settlement to the district court for review and a determination whether the settlement is fair and reasonable." (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982))).  To approve an FLSA settlement, the court must determine whether:  (1) the litigation involves a bona fide dispute, (2) the proposed settlement is fair and equitable to all parties, and (3) the proposed settlement contains an award of reasonable attorney's fees.  *Barbosa v. Nat'l Beef Packing Co.*, No. 12-2311-KHV, 2015 WL 4920292, at *5 (D. Kan. Aug. 18, 2015) (citing *McCaffrey v. Mortg. Sources, Corp.*, No. 08-2660-KHV, 2011 WL 32436, at *2 (D. Kan. Jan. 5, 2011)).  The court addresses each consideration, below.

### a.   Bona Fide Dispute

Before approving an FLSA settlement, the parties must submit sufficient information for the court to conclude that a bona fide dispute exists.  *McCaffrey*, 2011 WL 32436, at *4 (citing *Dees v. Hydradry, Inc.*, 706 F. Supp. 2d 1227, 1241 (M.D. Fla. 2010)).  To satisfy this obligation, the parties must provide the court with:

> (1) a description of the nature of the dispute (for example, a disagreement over coverage, exemption or computation of hours worked or rate of pay); (2) a description of the employer's business and the type of work performed by the employees; (3) the employer's reasons for disputing the employees' right to a minimum wage or overtime; (4) the employees' justification for the disputed wages; and (5) if the parties dispute the computation of wages owed, each party's estimate of the number of hours worked and the applicable wage.

*Id.*

The court finds that plaintiffs have submitted information sufficient for the court to find a bona fide dispute exists.  As already discussed, *see supra* Part I, plaintiffs worked as RNs for defendant entities affiliated with HCA Healthcare.  They assert that defendants failed to compensate them, and other similarly situated employees, for all the time that they had worked during their employment.  More specifically, plaintiffs allege that defendants edited their time records to make their clock-in, clock-out, and lunch break times inaccurate.  As a result, plaintiffs allege, their time records reflected less time than they actually had worked.  And, as a consequence, defendants didn't pay plaintiffs (and other similarly situated employees) for all of the time they actually had worked for defendants.  Defendants deny plaintiffs' allegations.  They assert that they made changes to employee time records only to coincide with a change requested by an RN, to correct time records to align with the sign-in and sign-out times that RNs made in the log book or other records, or to record the time worked when an RN forgot to clock-in or clock-out.  Thus, defendants contend, their time-keeping practices never violated federal or Kansas law.  The court concludes that the claims in this case present a bona fide dispute whether defendants violated the FLSA, with the potential for either side to prevail if the case continued.

### b.  Fairness and Equity

The court next decides whether the proposed settlement is a fair and equitable one.  To qualify as "fair and reasonable, an FLSA settlement must provide adequate compensation to the

employee and must not frustrate the FLSA policy rationales." *Solis v. Top Brass, Inc.*, No. 14-cv-00219-KMT, 2014 WL 4357486, at *3 (D. Colo. Sept. 3, 2014). To determine if the proposed settlement is fair and equitable, courts regularly examine the factors that apply to proposed class action settlements under Rule 23(e). *Barbosa v. Nat'l Beef Packing Co., LLC*, No. 12-2311-KHV, 2014 WL 5099423, at *7 (D. Kan. Oct. 10, 2014); *Tommey*, 2015 WL 1623025, at *2. Those factors include:

> (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.

*Id.* As our court recognizes, these factors may demonstrate that a settlement agreement is fair and reasonable, but they are not determinative. *See McCaffrey*, 2011 WL 32436, at *5 (explaining that the Rule 23(e) factors "provide a general framework for the Court's determination whether an FLSA settlement is fair, but they are not determinative"). In addition to the four factors listed above, the court also must determine "that the proposed settlement is fair and equitable to all parties in light of the history and policy of the FLSA." *Gambrell*, 2012 WL 5306273, at *5. After reviewing the parties' proposed settlement, the court finds that plaintiffs satisfy the Rule 23(e) factors.

*First*, the settlement was fairly and honestly negotiated. After many months of actively litigating the case, the parties negotiated their settlement agreement through experienced counsel and using the services of a neutral, third-party mediator to assist in those negotiations. The parties reached their agreement after arm's-length negotiations. Thus, the first factor favors finding the proposed settlement fair and equitable.

*Second*, plaintiffs have established that the case involves serious questions of law and fact that place the ultimate outcome of the litigation in doubt.  The parties strongly dispute whether defendants' time keeping policies failed to compensate them for all of the time that plaintiffs and other similarly situated employees worked.  Defendants argue that they did compensate plaintiffs and others similarly situated for all of the time that they had worked, and thus they have not violated the FLSA or Kansas law.  In contrast, plaintiffs contend that defendants improperly edited their time records to reflect that members of the collective action worked less than they actually worked.  And, as a consequence, defendants failed to compensate collective action members for all of the time they actually worked.  The parties' conflicting positions pose serious questions of law and fact.  The second factor thus favors finding the proposed settlement fair and equitable.

*Third*, the parties' proposed settlement provides the value of an immediate recovery to the opt-in plaintiffs now, and that value outweighs the mere possibility of future relief after protracted and expensive litigation.  So, this third factor favors a finding that the proposed settlement is fair and equitable.

*Last*, plaintiffs assert that the settlement is fair, reasonable, and adequate.  Defendants don't contest that assertion.  The fourth factor thus favors approving the proposed settlement as fair and equitable.

In sum, the court finds that all four factors favor approving the proposed settlement as fair and equitable.  But, in addition to the four factors, the court also must determine "that the proposed settlement is fair and equitable to all parties in light of the history and policy of the FLSA."  *Gambrell*, 2012 WL 5306273, at *5.  The court has reviewed the parties' proposed

settlement with those considerations in mind.  And, for the most part, the court finds that the proposed settlements' terms are fair and equitable.

But, the court can't approve one portion of the proposed Settlement Agreement—the portion of the Settlement Agreement that recites defendants' agreement not to oppose the named plaintiffs' requested service awards in exchange for the named plaintiffs' release of defendants from all claims "regarding any and all subject matters whatsoever[.]"  Doc. 96-1 at 24–25 (Settlement Agreement ¶¶ 49, 51).  As explained in more detail below, many courts have refused to approve broad releases like this one in exchange for a defendant's agreement not to oppose a requested service award.  So, the court won't approve preliminarily the parties' Settlement Agreement because it contains this overly broad release.

But, before explaining why the court can't approve the Settlement Agreement's overly broad release for the named plaintiffs, the court addresses other portions of the Settlement Agreement that it does approve.  The court has reviewed thoroughly the parties' proposed Plan of Allocation.  The court commends plaintiffs' counsel for providing a comprehensive and detailed explanation of the Proposed Plan of Allocation.  As already discussed, plaintiffs' counsel formulated a proposed Plan of Allocation that is based on counsel's estimated damages calculations and takes into account relevant and differing facts among the class members.  Doc. 94-2 at 18–19 (Paulus Decl. ¶¶ 64–65).  Under the proposed Plan of Allocation, each class member will receive a pro rata share of designated KWPA Allocated Funds and FLSA Allocated Funds for their class cohort.  *Id.* (Paulus Decl. ¶ 68).  The parties calculate that the Proposed Plan of Allocation produces an average total settlement award of about $1,800 for class members who worked for defendant Midwest Division-MMC, LLC and an average total settlement award of about $575 for class members who worked for defendants HealthTrust Workforce Solutions,

LLC and Health Midwest Ventures Group, Inc.  *Id.* at 24 (Paulus Decl. ¶ 87).  And, the parties

assert, the proposed Plan of Allocation produces settlement awards ranging from about 80–90%

of class members' total, estimated alleged damages—including liquidated damages—as

calculated by counsel.  *Id.* at 25 (Paulus Decl. ¶ 91).

Also, plaintiffs' counsel explains that "the pro rata settlement shares in the Plan of

Allocation are premised on [p]laintiffs' counsel's admittedly aggressive damage calculations—in

which [counsel] assume[d] that every edit to class members' time records is improper, and thus,

an alleged violation of the FLSA or KWPA[.]"  *Id.* at 25–26 (Paulus Decl. ¶ 92).  As a

consequence, plaintiffs' counsel asserts, "the settlement awards likely exceed any true 'best day

in court' recovery that class members could potentially achieve were they to prevail on these

claims."  *Id.*  Based on the information supplied by counsel, the court finds that the parties'

proposed settlement—through the Plan of Allocation—provides adequate compensation to

collective action members that is fair and equitable.

The court also approves the parties' proposal for reallocating unclaimed settlement funds.

The parties recognize that redistributing unclaimed settlement funds to participating class

members may produce a windfall for those participants.  *Id.* at 23 (Paulus Decl. ¶ 83).  So the

parties agreed to cap any reallocation or redistribution of unclaimed settlement funds to an

amount not exceeding "a certain percentage of class members' individual, total alleged

liquidated, overtime and/or alleged straight time damages" as plaintiffs' counsel has calculated.

*Id.*; *see also* Doc. 94-1 at 19–20 (Settlement Agreement ¶ 39).  After that reallocation, the parties

have agreed to distribute 50% of any remaining amounts of unclaimed settlement funds to *cy*

*pres* recipient, the HCA Hope Fund.  Doc. 94-2 at 24 (Paulus Decl. ¶¶ 85–86).  And, the parties

have agreed that the remaining 50% of unclaimed settlement funds will revert to defendants.  *Id.* (Paulus Decl. ¶ 85).

Although this court—in the Rule 23 class action settlement context—previously has recognized that "most courts strongly disfavor" reversion provisions, it also has recognized that "does not mean that a reversion provision is never permissible."  *Bailes v. Lineage Logistics, LLC*, No. 15-cv-02457-DDC-TJJ, 2016 WL 4415356, at *6–7 (D. Kan. Aug. 19, 2016) (collecting cases).  Here, the proposed reversion doesn't prevent collective action members from receiving an adequate recovery.  To the contrary, it prevents collective action members from recovering a windfall from reallocated settlement funds by capping the amount that a collective action member can receive from reallocation.  Then, after reallocation, the proposed settlement provides that only half of the remaining unclaimed settlement funds revert to defendants while the other half reverts to an appropriate *cy pres* recipient.

Other courts have approved settlements with similar reversion and *cy pres* provisions. *See Grove v. ZW Tech, Inc.*, No. 11-2445-KHV, 2012 WL 4867226, at *4 (D. Kan. Oct. 15, 2012) (approving FLSA settlement that required any "unclaimed monies [to] revert to defendant" and finding that requirement reasonable "because each putative class member who does not opt in maintains his or her claim"); *see also McKeon v. Integrity Pizza LLC*, No. 18-cv-0932-WJM-KLM, 2020 WL 6782238, at *4 (D. Colo. Nov. 18, 2020) (approving distribution of unclaimed settlement funds in FLSA and Colorado wage claim settlement to a foundation that "provides financial help to Domino's team members—like the Class members—in times of hardship and adversity" and finding the "*cy pres* award [was] appropriate and the next best use of funds to provide an indirect class benefit for the Class members" based on "the nature and objective of the lawsuit"); *Childs v. Unified Life Ins. Co.*, No. 10-CV-23-PJC, 2012 WL 13018913, at *3

(N.D. Okla. Aug. 21, 2012) (explaining that, while reversion provisions "can warrant close scrutiny," they nevertheless "are acceptable when class members receive full recovery for their damages and the parties agree to the reversion" (citation and internal quotation marks omitted)). For the same reasons, the court finds that the parties' proposal for distributing the unclaimed settlement funds is fair and equitable.

The court now addresses its concern about the Settlement Agreement's release requiring the named plaintiffs to release all claims against defendants in exchange for defendants' agreement not to oppose their requested service awards.

### i.    Named Plaintiffs' Release in Exchange for Service Awards

As already explained, the Settlement Agreement requires the named plaintiffs to "release the Released Parties from any and all liability, damages, fees (including but not limited to attorney's fees and expert fees), costs, claims, and causes of action *regarding any and all subject matters whatsoever*, which they ever had or now have against the Released Parties arising or accruing at any time prior to the date of the Court's Final Approval Order."  Doc. 96-1 at 24 (Settlement Agreement ¶ 49) (emphasis added).  In exchange for the named plaintiffs' agreement to this broad release, defendants agree that they won't "contest[ ] their application for Service Awards," which is an award "in addition to, the amounts the [n]amed [p]laintiffs are entitled to recoup from the Plan of Allocation based on alleged lost wages[.]"  *Id.*

Courts prohibit plaintiffs from agreeing to an overly-broad release as part of a wage settlement under the FLSA.  *Elston v. Horizon Glob. Ams., Inc.*, No. 19-2070-KHV, 2020 WL 2473542, at *6 (D. Kan. May 13, 2020); *see also Bright v. Mental Health Res. Ctr., Inc.*, No. 3:10-cv-427-J-37TEM, 2012 WL 868804, at *4 (M.D. Fla. Mar. 14, 2012) ("Pervasive, overly broad releases have no place in settlements of most FLSA claims.").  As our court has

recognized, because "the FLSA requires employers to pay, unconditionally, a worker's wages," employers "cannot use the settlement of FLSA claims to extract a general release of claims before paying over the wages." *Elston*, 2020 WL 2473542, at *6 (citation and internal quotation marks omitted). This court has described broad releases as "unfair," and has recognized that they "provide[ ] employers with a windfall should some unknown claim accrue to the employee at a later time." *Id.* (citation and internal quotation marks omitted).

Thus, courts typically prohibit an FLSA plaintiff from agreeing to a general release of all claims and, instead, permit only a release of wage-related claims against an employer. *See Florece*, 2021 WL 5038773, at *10 (recognizing that a release "focused on wage-related claims . . . is permissible" (citing *Brittle v. Metamorphosis, LLC*, No. 20 CIV. 3880 (ER), 2021 WL 606244, at *4 (S.D.N.Y. Jan. 22, 2021)); *see also Gambrell v. Weber Carpet, Inc.*, No. 10-2131-KHV, 2013 WL 1659591, at *3 (D. Kan. Apr. 17, 2013) (approving amended settlement agreement that included "a release of only wage-related claims, which alleviate[d] the [c]ourt's previous concerns regarding a general release"). Here, the Settlement Agreement includes a release by settlement class members that appropriately limits the release to wage-related claims. *See* Doc. 96-1 at 7–8 (Settlement Agreement ¶ 16). The court finds that release for settlement class members is reasonable.

But, the named plaintiffs' release is different. It is broader, requiring a release of any claim "regarding any and all subject matters whatsoever[.]" *Id.* at 24 (Settlement Agreement ¶ 49). As our court has recognized, a broad release like the named plaintiffs' release here—isn't permissible in an FLSA settlement. *See, e.g.*, *Elston*, 2020 WL 2473542, at *6. The court recognizes, however, the context of the cases rejecting broad releases differs from the facts presented here. In those cases, the courts have approved the settlement class members' release

of their wage-related claims when the release is made in exchange for defendants' payment of settlement funds that compensates the settlement class members for their alleged lost wages. In contrast, here, defendants offer additional consideration to the named plaintiffs for their general release of all claims. In exchange for the general release, defendants agree they won't "contest[ ] their application for Service Awards," which is an award "in addition to, the amounts the [n]amed [p]laintiffs are entitled to recoup from the Plan of Allocation based on alleged lost wages[.]" Doc. 96-1 at 24 (Settlement Agreement ¶ 49).

Plaintiffs don't provide the court with any citation to legal authority approving an FLSA plaintiff's general release of claims in exchange for an employer's agreement not to contest a service award. The court's own research reveals a mixed bag of results.

Some judges in the Southern District of New York have found "reasonable" a "general release" that is "consideration for the receipt of the Named Plaintiff's Service Awards[.]" *Ray v. 1650 Broadway Assocs. Inc.*, No. 16-CV-9858 (VSB), 2020 WL 5796203, at *3 (S.D.N.Y. Sept. 29, 2020); *see also Bondi v. DeFalco*, No. 17-CV-5681 (KMK), 2020 WL 2476006, at *6 (S.D.N.Y. May 13, 2020) (approving "general release of all claims" that was "expressly offered as consideration for the payment of the Service Award to the Class Representatives" because plaintiffs provided "a sound explanation for how this broad release benefits" class representatives, and thus, release was "reasonable despite its breadth"). *But see Ramirez v. Ricoh Ams. Corp.*, No. 13-CV-9073(KNF), 2015 WL 413305, at *15 (S.D.N.Y. Jan. 30, 2015) (declining to approve FLSA and New York wage claim settlement that included broad release because "releasing the named plaintiff's claims solely upon the payment of the service award to him is contrary to the purpose of the remedial statutes at issue and the interests of the putative class members").

But, other courts—including our own—have refused to approve broad releases in FLSA settlement agreements exchanged as consideration for class representatives' service awards. *See Elston v. Horizon Glob. Ams., Inc.*, No. 19-2070-KHV, 2020 WL 2473542, at *6 (D. Kan. May 13, 2020) (refusing to approve an FLSA settlement that included "general release immuniz[ing] defendant from all claims" which, plaintiff argued, "justifie[d] the service award amount" because "defendant cannot use the settlement of FLSA claims to extract a general release of claims before paying over wages" (citation and internal quotation marks omitted)); *see also Cazeau v. TPUSA, Inc.*, 2:18-cv-00321-RJS-CMR, 2020 WL 3605652, at *10 (D. Utah July 2, 2020); *Alvarez v. BI Inc.*, No. 16-2705, 2020 WL 1694294, at *12 (E.D. Pa. Apr. 6, 2020). *Cf. Louangamath v. Spectranetics Corp.*, No. 18-cv-03634-JST, 2021 WL 9274552, at *5 (N.D. Cal. May 19, 2021) (refusing to approve broad release in Rule 23 class action settlement of wage and hour claims because a "service award is not intended to serve as consideration for the release of additional claims, but rather to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general" and noting that plaintiff's settlement of her own claim in exchange for an service award—"which comes from common fund monies that belong to the entire class"—"creates a potential conflict between herself and the putative class" (citation and internal quotation marks omitted)).

When it refused to approve a broad, general release as consideration for a service award, the Utah federal court recognized that service awards "are designed to induce individuals to become named representatives," and are awarded as consideration for the named representatives' "'service in prosecuting the action and for the risks they have incurred,'" but "not as consideration for [p]laintiffs' general release[.]" *Cazeau*, 2020 WL 3605652, at *10 (quoting

*Alvarez*, 2020 WL 1694294, at *12 (further citation and internal quotation marks omitted)).

And, as the Eastern District of Pennsylvania court explained, it approves "*service* awards to

Named Plaintiffs in consideration for exactly that, their service in prosecuting the action and for

the risks they have incurred." *Alvarez*, 2020 WL 1694294, at *12. Thus, it refused to approve

two named plaintiffs' broad general release in consideration for their service awards. *Id.* The

court noted that it was "otherwise without knowledge [of] the value of the non-FLSA claims

[n]amed [p]laintiffs have waived in consideration for their service awards" and that "the

indeterminate nature of [n]amed [p]laintiffs' release not only prevent[ed] [the court] from

evaluating the non-FLSA claims that they have waived, but also potentially provide[d]

[d]efendant with a windfall should some unknown claim later accrue." *Id.*

The court hasn't found any Tenth Circuit cases deciding this issue. But, the court

predicts, if presented with the issue, the Circuit would find persuasive the district court cases that

have declined to approve a broad general release that serves as consideration for defendants'

agreement not to contest plaintiffs' application for service awards. As a consequence, the court

predicts, our Circuit would refuse to approve the named plaintiffs' general release here.

Indeed, our court determines the reasonableness of service awards in an FLSA settlement

based on "the nature of each individual's involvement and the number of hours which he or she

has invested in the case." *Grove v. ZW Tech, Inc.*, No. 11-2445-KHV, 2012 WL 1789100, at *7

(D. Kan. May 17, 2012).[2] Thus, like the Pennsylvania federal court, our court approves "*service*

awards to Named Plaintiffs in consideration for exactly that, their service in prosecuting the

---

[2]      In the Rule 23 class action context, our court has explained that service awards "induce
individuals to become class representatives and reward them for time sacrificed and personal risk incurred
on behalf of the class." *Harlow v. Sprint Nextel Corp.*, No. 08-2222-KHV, 2018 WL 2568044, at *7 (D.
Kan. June 4, 2018) (citing *UFCW Loc. 880-Retail Food Emp. Joint Pension Fund v. Newmont Mining
Corp.*, 352 F. App'x 232, 235 (10th Cir. 2009)).

action and for the risks they have incurred." *Alvarez*, 2020 WL 1694294, at *12. Plaintiffs

recognize as much in their motion seeking approval of the service awards. To support the

requested amounts, plaintiffs supply information about the amount of time the named plaintiffs

invested in the suit and the risks they faced by joining the suit. *See* Doc. 99 at 12–17. Plaintiffs

briefly mention the "full release of potential or existing claims" against defendants, *id.* at 14, but

they don't explain the value of that broad release in the context of the total amounts requested for

the service awards. And, importantly, plaintiffs don't provide any authority permitting the court

to approve the broad, general release as consideration for defendants' agreement not to contest

the service awards. To the contrary, the court is persuaded by the reasoning of other federal

courts who have refused to approve broad releases made in exchange for service awards—like

the one here—because courts should approve service awards based on the named plaintiffs'

"service in prosecuting the action and for the risks they have incurred," and "not as consideration

for [p]laintiffs' general release." *Cazeau*, 2020 WL 3605652, at *10 (citation and internal

quotation marks omitted). For this reason, the court declines to approve preliminarily the

parties' proposed settlement.

### ii.   Service Awards

In conjunction with the proposed releases for the named plaintiffs, the court has reviewed

plaintiffs' requested service awards for those plaintiffs to determine if they are fair and

reasonable. Plaintiffs seek an $18,000 service award for plaintiff Chumba, a $12,000 service

award for plaintiff Marquez, and a $6,000 service award for plaintiff Perez. Doc. 99 at 12.

Plaintiffs recognize that our court previously has "found that $20.00 per hour is a

'reasonable incentive fee.'" Doc. 99 at 13 (quoting *Foster v. Robert Brogden's Olathe Buick*

*GMC, Inc.*, No. 17-2095-DDC-JPO, 2019 WL 1002046, at *7 (D. Kan. Feb. 28, 2019)); *see also*

*Barbosa*, 2015 WL 4920292, at *6 (rejecting proposed service award of $3,500 to each of the two named plaintiffs who spent 24.1 hours and 9.6 hours respectively on the case, and instead concluding that $20 per hour for the time plaintiffs devoted to the case was a fair and reasonable service award); *Peterson v. Mortg. Sources, Corp.*, No. 08-2660-KHV, 2011 WL 3793963, at *8 (D. Kan. Aug. 25, 2011) (finding "$20 per hour is a reasonable incentive fee").  But also, our court has approved service awards at a higher hourly rate when the proposed award was reasonable under the circumstances.  *See, e.g.*, *Enegren v. KC Lodge Ventures LLC*, No. 17-2285-DDC-GEB, 2019 WL 5102177, at *8–9 (D. Kan. Oct. 11, 2019) (reducing requested service award to $5,000 based on named plaintiff devoting 131 hours to the case, resulting in $38.16 per hour award); *see also In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1271 (D. Kan. 2006) (reducing requested service awards to each of four named plaintiffs from $15,000 to $5,000, even though the total settlement exceeded $25 million, because the $5,000 award adequately compensated each plaintiff for the 80 hours of time, on average, that each one devoted to the lawsuit, resulting in hourly rate of $62.50).

Here, plaintiff Chumba estimates he has devoted 366.5 hours to working on this case. Doc. 94-4 at 3–4 (Chumba Decl. ¶ 29).  Plaintiff Marquez estimates she has devoted 353.2 hours to the case.  Doc. 94-3 at 3–4 (Marquez Decl. ¶ 32).  And, plaintiff Perez estimates she has devoted 207 hours to the case.  Doc. 94-5 at 3 (Perez Decl. ¶ 24).  Thus, the requested service awards equate to $49.11 per hour for plaintiff Chumba, $33.97 per hour for plaintiff Marquez, and $28.98 per hour for plaintiff Perez.  These hourly rates are on the higher end of hourly rates approved by our court, but also, they don't depart significantly from those previously-approved rates.

Plaintiffs even recognize that their requested awards "equate to a higher hourly rate than $20.00 per hour each individual worked on the case" but they argue that several factors favor the proposed service awards, including "the named [p]laintiffs' typical hourly rates of approximately $45.00 or more in their regular employment (pay which they had to forego when missing work due to their participation in this lawsuit), the reputational risk they undertook by serving as named plaintiffs in a case against a current or former employer, *their agreement to a full release of potential or existing claims against [d]efendants*, and the amount of time they have devoted to this lawsuit—particularly under the uniquely challenging circumstances of the COVID-19 pandemic."  Doc. 99 at 14 (footnote omitted) (emphasis added).  The court agrees that each of these factors—save one—supports approving the service awards requested here.  But, for reasons already discussed, the court won't approve the portion of the agreement that identifies the named plaintiffs' general release as consideration for the service award.  So, the court can't approve the requested service awards on the current record.

### c.  Attorney's Fee Award

The FLSA requires a settlement of FSLA claims to include an award of reasonable attorney's fees and the costs of the action.  29 U.S.C. § 216(b); *see also McCaffrey*, 2011 WL 32436, at *2 (citing *Lee v. The Timberland Co.*, No. C 07-2367-JF, 2008 WL 2492295, at *2 (N.D. Cal. June 19, 2008)).  The court has discretion to determine the amount and reasonableness of the fee, but the FLSA fee award nevertheless is mandatory.  *Barbosa*, 2015 WL 4920292, at *4 (citations omitted).

Here, the parties' Settlement Agreement limits plaintiffs' counsel to seeking an award of $540,000 in attorneys' fees, or 30% of the Global Settlement Fund, and $2,100 in expenses and costs.  Doc. 96-1 at 9 (Settlement Agreement ¶ 18).  Also, the Settlement Agreement limits the

amount of Settlement Administration Costs (defined as all fees and costs incurred by the Settlement Administrator, including sending Notice) to $30,000. *Id.* Defendants have agreed not to oppose plaintiffs' application for attorneys' fees. *Id.* at 24 (Settlement Agreement ¶ 48). As our court has recognized, when "defendant agrees [not to] oppose an award of attorneys' fees from a common fund, defendant has no incentive to bargain for lower fees." *Barbosa*, 2014 WL 5099423, at *9. So, in those circumstances, our court "skeptically examine[s] and analyze[s] the fee and cost proposal." *Id.*

The Tenth Circuit applies a hybrid approach when deciding whether a requested fee award is reasonable, combining the percentage fee method with the specific factors traditionally used to calculate the lodestar. *Barbosa*, 2015 WL 4920292, at *7. When applying the percentage fee method, the court must find that the award is "reasonable and . . . must articulate specific reasons for fee awards demonstrating the reasonableness of the percentage and thus the reasonableness of the fee award." *Id.* (citing *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988)). The court recognizes that plaintiffs' fee request here—seeking fees in an amount that is 30% of the Global Settlement Fund—falls within the range of percentage fee awards that our court typically approves. *See, e.g.*, *Elston v. Horizon Glob. Ams., Inc.*, No. 19-2070-KHV, 2020 WL 6318660, at *7 (D. Kan. Oct. 28, 2020) (explaining that "attorneys' fees of one-third or thereabouts are generally deemed reasonable" (citation and internal quotation marks omitted)); *Barbosa*, 2015 WL 4920292, at *11 (finding that attorney fee request that was "33 per cent of the total settlement amount" was "within the customary percentage of the fund approved by this Court"). But, because plaintiffs haven't shown that the proposed settlement award is fair and equitable, approving any request for attorneys' fees and costs and for the Settlement Administrator Costs is premature at this time. Thus, the court denies without prejudice

plaintiffs' request for attorneys' fees and costs.  Plaintiffs may renew their motion if they move

the court to approve an amended settlement agreement that addresses the concerns that the court

has raised about the parties' current Settlement Agreement.

## 2.  Rule 23(e) Settlement Approval

Next, the court addresses plaintiffs' request to approve the KWPA settlement under Rule

23.  Rule 23(e) requires court approval of the parties' settlement of a certified class action.  The

court may approve a settlement only after finding that it is "fair, reasonable, and adequate[.]"

Fed. R. Civ. P. 23(e)(2).  When making this determination, Rule 23(e)(2) instructs courts to

consider whether:

> (A) the class representatives and class counsel have adequately represented the
>     class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i)      the costs, risks, and delay of trial and appeal;
>> (ii)     the effectiveness of any proposed method of distributing relief to
>>        the class, including the method of processing class-member claims;
>> (iii)    the terms of any proposed award of attorney's fees, including
>>        timing of payment; and
>> (iv)    any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Rule 23(e)(2).  Also, the Tenth Circuit has instructed courts to consider the following four

factors when assessing whether a proposed settlement is "fair, reasonable, and adequate":

> (1) whether the proposed settlement was fairly and honestly negotiated;
> (2) whether serious questions of law and fact exist, placing the ultimate outcome
>     of the litigation in doubt;
> (3) whether the value of an immediate recovery outweighs the mere possibility of
>     future relief after protracted and expensive litigation; and
> (4) the judgment of the parties that the settlement is fair and reasonable.

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002).

The settlement approval process typically occurs in two phases.  First, the court considers

whether preliminary approval of the settlement is appropriate.  William B. Rubenstein, *Newberg*

*on Class Actions* § 13:10 (5th ed. 2020); *Freebird, Inc. v. Merit Energy Co.*, No. 10-1154-KHV, 2012 WL 6085135, at *4 (D. Kan. Dec. 6, 2012).  "If the [c]ourt grants preliminary approval, it directs notice to class members and sets a hearing at which it will make a final determination on the fairness of the class settlement." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 286 F.R.D. 488, 492 (D. Kan. 2012); *see also Newberg on Class Actions* § 13:10 ("[T]he court's primary objective [at the preliminary approval stage] is to establish whether to direct notice of the proposed settlement to the class, invite the class's reaction, and schedule a final fairness hearing.").  Second, "taking account of all of the information learned during [the preliminary approval] process, the court decides whether or not to give 'final approval' to the settlement." *Newberg on Class Actions* § 13:10.

Here, the court declines to approve preliminarily the parties' proposed settlement under Rule 23(e), for the same reasons that it declines to approve preliminarily the settlement under the FLSA.  The court can't find the proposed Settlement Agreement is fair, reasonable, and adequate.  Specifically, it can't discern whether the settlement "treats class members equitably relative to each other[,]" Fed. R. Civ. P. 23(e)(2)(D), because it contains the named plaintiffs' broad release which serves as consideration for defendants' agreement not to contest their requested service awards.  Thus, the court can't approve preliminarily the parties' proposed settlement under Rule 23(e).  *See Florece*, 2021 WL 5038773, at *13 (declining to approve the proposed Settlement Agreement because the parties hadn't provided enough information for the court to evaluate whether the settlement provides adequate relief to class members); *see also Elston*, 2020 WL 2473542, at *7 (declining to approve a KWPA settlement where the plaintiff did not adequately explain the basis for her damage calculations, and the court could not determine whether the proposed settlement amount was "fair, reasonable and adequate").  As a

consequence, the court denies without prejudice plaintiffs' request that the court approve the settlement preliminarily under Rule 23(e).  Plaintiffs may renew their request if they move the court to approve an amended settlement agreement.

### C.  Notice

As already explained, the court has certified for settlement purposes a Rule 23 class action and an FLSA collective action.  The FLSA requires plaintiffs to join a collective action by opting in to the lawsuit.  *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").  Thus, putative collective action members must "receiv[e] accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate."  *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *see also Wade v. Furmanite Am., Inc.*, No. 3:17-CV-00169, 2018 WL 2088011, at *7 (S.D. Tex. May 4, 2018) ("[T]he purpose of notice is to inform potential class members of the lawsuit and provide them the opportunity to join the case[.]").  Our court recognizes that it "has the power and duty to ensure that the notice is fair and accurate, but it should not alter plaintiff's proposed notice unless such alteration is necessary."  *Christeson v. Amazon.com.ksdc, LLC*, No. 18-2043-KHV, 2019 WL 2137282, at *4 (D. Kan. May 16, 2019); *see also Hoffmann-La Roche*, 493 U.S. at 172 ("By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative.").

For Rule 23 class actions, when the court certifies a class action under Fed. R. Civ. P. 23(b)(3), it "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through

reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The notice must "clearly and concisely state in

plain, easily understood language,"

> (i)     the nature of the action;
> (ii)    the definition of the class certified;
> (iii)   the class claims, issues, or defenses;
> (iv)    that a class member may enter an appearance through an attorney if the member so desires;
> (v)     that the court will exclude from the class any member who requests exclusion;
> (vi)    the time and manner for requesting exclusion; and
> (vii)   the binding effect of a class judgment on members under Rule 23(c)(3).

*Id.*

Also, as part of Rule 23's settlement approval process, "[t]he court must direct notice in a

reasonable manner to all class members who would be bound by the proposal[.]"  Fed. R. Civ. P.

23(e)(1)(B).  Rule 23(e), however, imposes a less stringent notice standard than Rule

23(c)(2)(B).  Rule 23(c)(2)(B) requires the court to direct to class members "the best notice that

is practicable under the circumstances."  "Such notice is essential . . . to ensure that class

members who desire to pursue their own claims individually have the opportunity to exercise

their right to opt out of the class."  *Gottlieb v. Wiles*, 11 F.3d 1004, 1012 (10th Cir. 1993),

*abrogated on other grounds by Devlin v. Scardelletti*, 536 U.S. 1 (2002).  By contrast, Rule 23(e)

merely requires "notice in a reasonable manner to all class members who would be bound" by

the proposed settlement.  Fed. R. Civ. P. 23(e)(1).

"In addition to the requirements of Rule 23, the [C]onstitution's Due Process Clause also

guarantees unnamed class members the right to notice of certification or settlement."  *DeJulius v.*

*New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935, 943–44 (10th Cir. 2005) (citing U.S.

Const. amend. V (further citations omitted)).  "For due process purposes, rather than looking at

actual notice rates, our precedent focuses upon whether the district court gave 'the best notice

practicable under the circumstances including individual notice to all members who can be identified through reasonable effort.'" *Id.* at 944 (quoting *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1110 (10th Cir. 2001)). "The legal standards for satisfying Rule 23(c)(2)(B) and the constitutional guarantee of procedural due process are coextensive and substantially similar." *Id.*

Here, class members have not yet received any notice of this class action or the proposed settlement. Thus, the court must direct that they receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). But, in cases where our court has declined to approve preliminarily a settlement agreement, our court has found it "premature" to approve the proposed Notice and Claim Forms. *See Florece*, 2021 WL 5038773, at *14; *see also Christeson*, 2019 WL 2137282, at *4. Nevertheless, in one of those cases, our court reviewed the parties' proposed notice and claims forms and "identified" several "areas of concern" and directed the parties to correct the "issues . . . in advance of filing a renewed motion for preliminary settlement approval." *Florece*, 2021 WL 5038773, at *14. The court has completed a similar review here of the Notice and Claim Form submitted with plaintiffs' motions. Doc. 96-1 at 39–46 (Ex. B to Settlement Agreement). It finds that the proposed Notice and Claim Form " is fair and accurate[.]" *Christeson*, 2019 WL 2137282, at *4. Also, the proposed Notice and Claim form contains the information required by Rules 23(c)(2)(B) and (e). Thus, the court is prepared to approve the Notice and Claim Form if the parties submit an amended Settlement Agreement that secures the court's preliminary approval of the settlement.

## V.    Conclusion

For reasons explained, the court grants in part plaintiffs' Unopposed Motion for Order Certifying Class and Collective Action for Purposes of Settlement, Preliminarily Approving

Class and Collective Action Settlement, Directing Notice to the Class, Appointing Class Counsel, and Scheduling Final Approval Hearing (Doc. 93), and also denies the motion in part. Specifically, the court grants plaintiffs' requests:

- to certify a Rule 23 class action for settlement purposes;

- to certify conditionally an FLSA collective action for settlement purposes;

- to appoint plaintiffs Tammie Marquez, Neesha Perez, and Josiah Chumba as class representatives; and

- to appoint Mary Katherine Paulus and Jessica M. McDowell of Cornerstone Law Firm as class counsel.

But, the court denies without prejudice to refiling the requests to approve preliminarily the parties' proposed settlement, direct notice to the class, and schedule a Final Approval Hearing.

Consistent with this Order, the court certifies a Rule 23 settlement-only class for plaintiffs' KWPA claims and certifies conditionally a settlement-only class under 29 U.S.C. § 216(b) of the FLSA, defined as: "all hourly Registered Nurses who performed work for Defendants at Menorah Medical Center between July 3, 2016 and February 28, 2019."

Also, the court denies without prejudice plaintiffs' Unopposed Motion for Approval of Attorneys' Fees Award, Litigation Costs, Settlement Administrator and Class Representative Service Awards (Doc. 98). The court denies without prejudice the portion of the motion seeking approval of the service awards because the court declines to find that the proposed Settlement Agreement's terms governing the service awards are fair and equitable. And, the court denies without prejudice to refiling the portion of the motion seeking approval of attorneys' fees, litigation costs, and Settlement Administrator costs because it is premature.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' Unopposed Motion for Order Certifying Class and Collective Action for Purposes of Settlement, Preliminarily Approving Class and Collective Action Settlement, Directing Notice to the Class, Appointing Class Counsel, and Scheduling Final Approval Hearing (Doc. 93) is granted in part and denied in part without prejudice.

**IT IS FURTHER ORDERED THAT** plaintiffs' Unopposed Motion for Approval of Attorneys' Fees Award, Litigation Costs, Settlement Administrator and Class Representative Service Awards (Doc. 98) is denied without prejudice.

**IT IS FURTHER ORDERED THAT** the parties must notify the court, **on or before October 20, 2022**, of their intention either to (1) file a revised settlement agreement and supporting documentation in accordance with this Memorandum and Order; or (2) abandon settlement and proceed to litigate this dispute.

**IT IS SO ORDERED.**

**Dated this 20th day of September, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

44